325 So.2d 531

**Richard Darnell ZUCK**

v.

**STATE.**

**6 Div. 794.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1975.

Rehearing Denied Oct. 21, 1975.

16

Robert R. Bryan, Birmingham, for appellant.

William J. Baxley, Atty. Gen., and David L. Weathers, Quentin Q. Brown, Jr., Asst. Attys. Gen., Birmingham, for appellee, the State.

DeCARLO, Judge.

In June of 1974, the appellant was placed on trial in the Circuit Court of Jefferson County on an indictment charging him with first degree murder.

A jury was selected and the State presented the following evidence:

At 6:16 A.M. on December 5, 1973, members of the Vestavia Fire Department responding to a radio dispatch went to the Zuck home on Beaumont Circle in Vestavia, Jefferson County, Alabama. Upon their arrival they were directed to a bedroom where they discovered the body of Gordon D. Zuck.

Captain Gerald of the fire department recalled there was a large amount of blood on the ceiling and walls of the room.

Sergeant Kines of the Vestavia Police Department was the first police officer on the scene and his description of the scene was the same as the fire captain's. He added that appellant arrived about 7:00 A. M. and became very emotional when told of Mr. Zuck's death.

During the search of the house for weapons, another policeman found a hatchet and a hunting knife. These items and the general area were dusted for fingerprints but none were identified as appellant's. A footprint was found on a newspaper near the chair where the body was found, but it was not the appellant's. A search of the basement revealed that the door leading into the house from the basement was open but nothing was found to indicate it had been forced.

J. O. Butler, the coroner, observed that rigor mortis had begun in the deceased, and he later concluded time of death to be approximately 12:05 A.M., with thirty or forty minutes range of error on either side of midnight.

Dr. Jean Garrick performed an autopsy on the deceased and estimated the time of death at about an hour and a half on either side of midnight. She recalled there was a total of eighteen lacerations to the scalp of deceased and these, along with the fractures to the skull, caused a large opening that exposed the brain. It was her opinion death was due to the brain injuries.

Morton Hall, a newspaper deliveryman testified that at approximately 2:30 A.M. on December 5, 1973, he saw a car parked in front of the Zuck house with a person standing at the driver's side. He identified appellant as that person.

Mrs. Douglas Hayes, owner of Plaza Cleaning Center in Vestavia, testified she knew appellant when he brought some cleaning in on December 8, 1973. When the clothing was separated for cleaning she noticed that a pair of pants bore dark reddish spots on the front of the legs. In her presence an employee removed the spots with a chemical used to remove blood stains. It was her judgment that the spots looked like blood.

Barbara Hodge and Alice Salter each testified they were former girl friends of the appellant and stated he had made various incriminating statements about his step-father's death.

During Barbara Hodge's testimony she recalled that on December 3, 1973, while she was eating lunch with the accused, he asked for a nerve pill. As she reached into her purse the appellant remarked, ". . . [D]o you have anything to bump off my ole man? . . . [M]y father is driving me nuts." She laughed and appellant said he was serious. Barbara then responded she knew where he could get a "hit man" real cheap. Later, after she returned to work, appellant phoned and told her that his parents were going bankrupt. He explained they wanted to merge with his company and he could not sit by and watch everything his mother had worked for go down the drain. Further, she stated that sometime between December 7 and Christmas Eve, Richard told her he was out with his mother and Alice Salter on December 4, 1973, and afterwards he and his mother went to his apartment for the remainder of the night.

Alice Salter testified she saw Richard and his mother on the night of December 4, 1973, in Rodeway Lounge where she

worked. It was about 8:30 or 9:00 P.M. when they arrived and Richard left around 9:30 P.M. for about forty-five minutes. On his return he informed Miss Salter he was expecting a phone call which he subsequently received about 11:15 P.M. After the phone conversation appellant remarked, "Alice, I got the money I needed, but you are going to hate me when you find out how I got it." Before leaving, appellant told Miss Salter: "Alice, daddy is dead . . . I'll explain to you later, meet me at the apartment when you get off from work." Appellant then left the lounge with his mother.

Appellant lived directly above Miss Salter, and the next day around 5:00 or 5:30 A.M. she heard him enter his apartment. She phoned to ask if he would like some coffee and he said yes, bring it up. When she arrived at his apartment he received a telephone call. After hanging up he exclaimed, "Daddy is dead, stay here in the apartment, don't leave until I get back."

Each of the former girl friends admitted when she was initially contacted by the police they disavowed any knowledge of the homicide.

Through Gordon Zuck's business accountant it was established that deceased was losing money in some of his businesses and not showing a profit in others.

Testimony was elicited that deceased was insured for approximately two-hundred thousand dollars and Ruth Zuck, wife of the deceased, was the beneficiary of all except five thousand dollars. Approximately sixty-five thousand was assigned to the City National Bank of Birmingham.

The State Toxicologist testified he had examined the hatchet and that he did not find any traces of blood or hair.

William Earl Salter testified that he had seen his sister, Alice Salter, shortly before Christmas of 1973. At that time she told him that Richard Zuck had said, ". . . [T]here were three men in Birmingham on the day or at the time his father was killed

and he believed they were responsible for his death and he also believed that they had some connection with organized crime."

Upon completion of this testimony, the State rested and appellant did not offer any evidence.

The jury subsequently found Richard Zuck guilty of second degree murder and fixed his punishment at forty years.

Following his conviction appellant filed a motion for a new trial, contending among other things that the evidence was insufficient and new evidence had been discovered which absolved him of guilt.

In support of this motion the appellant presented the affidavit and testimony of his fifteen-year-old brother, Lou Zuck. He testified that on the night of his adopted father's death, he had gone to bed before midnight and was awakened between 3:00 and 4:00 A.M., by what he thought were his father's screams. He then ran to his father's room and saw Jennifer Worthington striking him with a rod or tire tool. At that moment Jackie Farris came from the doorway of the dressing room and instructed him to return to his bedroom and stay there. Lou ran back to his bedroom where he cried and prayed until approximately 6:00 A.M., when his mother and sister came to his room screaming. They informed him something had happened to "Dad", and after they called the police, Lou ran down the street to get a doctor.

Although his mother and sister did not question him, Richard did when he arrived, and Lou answered he didn't know anything about it. It wasn't until the night of his brother's conviction on June 14, 1974, did he relate this story to anyone and then to his sister, Susan. Later that same night, Richard's lawyers were called and Lou told them what had occurred.

Further, Lou stated neither Jennifer Worthington nor Farris ever mentioned the incident or threatened him.

On cross-examination Lou admitted police officers had made numerous inquiries as to what he knew or heard on the night in question, and he told them nothing.

Lou appeared before the grand jury in December, 1973, and exercised his fifth amendment right to remain silent. It was only at the grand jury meeting following Richard's conviction that Lou related the foregoing facts.

At the conclusion of Lou Zuck's testimony, the State called Jennifer Worthington who presented this evidence:

In July, 1973, she began working as a secretary with the Automated theaters, a business owned by the Zuck family. At that time, Richard was involved with the sale of franchises and Susan Morton, his sister, was in charge of the accounting.

Jennifer recalled having more than one conversation with appellant prior to December 5, 1973, concerning the financial difficulties of the Zuck business. She remembers one specific conversation with Richard at the Vestavia Cinema two or three days before the Alabama-Auburn game. On that occasion Jackie Farris, Joan Farris and Susan Morton were also present. Richard and Jackie Farris discussed how Mr. Zuck could be killed without their involvement being discovered. Richard said it would be worth fifty thousand dollars to whoever did the killing.

Jackie Farris commented chloroform might be used if Mr. Zuck could be caught sleeping.

Around December 3, 1973, Richard told Jennifer that his mother had checks outstanding that could not clear the bank and the business was in financial trouble. He said his step-father would have to be killed or the business would go bankrupt.

On Tuesday, December 4, 1973, Jennifer talked with appellant in his office about 2:00 P.M. They were alone at the time and again Richard spoke of the businesses' financial difficulty. He added that something had to be done about his father very

soon and inquired if she knew someone who would kill him. Jennifer remarked she was sure someone could be obtained for a price.

Richard left and sometime during the afternoon, Jackie Farris came to the office. Jackie said he had been thinking about what Richard had said and asked if Richard had found anyone to do away with his father. Jackie inquired if appellant had mentioned any specific sum of money, and Jennifer replied, twenty-five thousand.

About 7:00 P.M. that evening, Jennifer spoke with Richard by phone and related her conversation with Jackie Farris. He told Jennifer something had to be done about his father that night and she should have Jackie Farris come to her apartment so they could call appellant at the "Rodeway." It was Richard's plan to use some of her pain pills in hot chocolate which he would take to his father that night. He told Jennifer he would have the money when Mr. Zuck's insurance was settled.

About 10:30 or 10:45 P.M. while Jackie Farris was in her apartment, they phoned appellant at the "Rodeway" and made arrangements to meet at the Pancake House in Vestavia. While at the Pancake House, Jennifer gave Richard a medicine bottle containing four or five dissolved pain pills. Appellant explained he had to return to his father's house and asked them to meet him later at the Dobbs House in Homewood. Richard stated he was going to pay each of them twelve thousand five hundred dollars. He then purchased two cups of hot chocolate and left.

Jennifer and Jackie waited at the Dobbs House until 1:00 A.M. when Richard came in and told them he had to go to the office with his father. He planned to give his father the hot chocolate then, and afterwards bring them a key to the house. The three of them were to meet again later outside the Pancake House. Jennifer and Jackie waited until 3:30 A.M. when Jackie phoned the Zuck residence. Richard answered the phone and stated he had fallen

asleep but would meet them shortly. After appellant arrived he gave them the key to the basement door. He assured her and Jackie they would be twenty-five thousand dollars richer when the night was over.

Jennifer and Jackie drove to the Zuck house and parked in the driveway near the basement. Jackie got out, opened the trunk and removed a tire tool. They unlocked the basement door, went upstairs into Mr. Zuck's bedroom and closed the door behind them. Mr. Zuck stood up and Jackie hit him with the tire tool. He fell back in the chair and Jackie hit him a couple more times. Jennifer admitted she also hit Mr. Zuck with the tire tool. Afterwards, Jackie placed a windbreaker over the head of the deceased and they left with Mr. Zuck's wallet, watch and the tire tool.

Jennifer stated that Mr. Zuck did not scream and she did not see Lou Zuck on that occasion.

Between 5:30 and 6:00 A.M. they arrived at her apartment and phoned appellant to notify him they were back.

On Thursday night after the killing, Richard told them it looked as though he would be indicted for murder but he didn't think there was sufficient evidence.

During cross-examination, Jennifer explained she had not been promised any particular number of years in exchange for her testimony. She did admit having an abortion on Monday, December 3, 1973, before the murder but denied the pain pills taken in conjunction with the operation impaired her perception or recall.

At the conclusion of the hearing the trial court denied the motion for a new trial and this appeal followed.

I

Appellant insists that the trial court's denial of his motion was error and an abuse of discretion.

The general principles applicable to a motion for a new trial on the claim of newly discovered evidence are found in *Hodge v. State,* 32 Ala.App. 283, 26 So.2d 274. Specifically, the court stated that such a motion must be predicated on the following requirements:

". . . '(1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; (5) that it is not merely cumulative, or impeaching.' "

Although appellate courts do not favor granting new trials on these grounds, much is left to the trial court's discretion, and its decision will not be revised unless an abuse is shown. *Hodge,* supra; *Aaron v. State,* 181 Ala. 1, 61 So. 812; *Slaughter v. State,* 237 Ala. 26, 185 So. 373; *Welch v. State,* 28 Ala.App. 273, 183 So. 879.

In denying appellant's motion, the trial court concluded:

"1. That the totality of the evidence adduced at the hearing on the motion for new trial is generally supportive of the verdict of the jury and corroborates certain important facts adduced at the trial in chief.

"2. That the defendant has failed to meet the burden that the evidence adduced in the motion for new trial was newly discovered evidence."

We have no reason to interfere with that exercise of discretion under the facts shown. Their credibility was for the trial judge. *Dawson v. State,* 44 Ala.App. 525, 215 So.2d 459.

The concept of due diligence was explained by the Iowa Supreme Court in *Westergard v. Des Moines Ry. Co.,* 243 Iowa 495, 52 N.W.2d 39, and we quote approvingly.

". . . The showing of diligence required is that a reasonable effort was made. The applicant is not called upon to prove he sought evidence where he had no reason to apprehend any existed. He must exhaust the probable sources of information concerning his case; he must use that of which he knows, and he must follow all clues which would fairly advise a diligent man that something bearing on his litigation might be discovered or developed. But he is not placed under the burden of interviewing persons or seeking in places where there is no indication of any helpful evidence."

In his effort to satisfy this burden, appellant asserts in sworn affidavit that he had no reason to suspect his brother, Lou Zuck, witnessed the murder. Further he had no reason to suspect that Jennifer Worthington or Jackie Farris was involved in the killing.

From the time the body was discovered it was known that Lou Zuck was in the house at the time of the murder, and it was reasonable to believe that appellant would have questioned him as a "probable source of information."

Further, Lou Zuck's refusal to speak before the grand jury should have alerted the appellant. Surely this, in and of itself, should have afforded a "clue" that Lou had information pertaining to the case.

If the evidence presented at the hearing was believed, then the court could have concluded appellant was not diligent.

Added to these facts, the trial court had affidavits of defense counsel stating they had talked to Lou Zuck, Jennifer Worthington and Jackie Farris on more than one occasion. Not until the night of June 14, 1974, did anyone of those named, ever indicate in any way, that Lou Zuck had seen Jennifer Worthington kill Gordon Zuck. Also the court had before it Lou Zuck's admission that he told law enforcement officers "he knew nothing."

■ We agree this was not "newly discovered evidence". It is beyond belief that a fifteen-year old could witness the bludgeoning death of his father and remain silent. It strains comprehension that he would withhold this information after his brother, whom he professed to love, was indicted for the murder. Further, it seems incredible that he could sit in a witness room for five days while his brother was being tried in the adjoining room, knowing full well someone else had struck the fatal blows.

Counsel has argued that the new evidence in all probability would raise a reasonable doubt as to the guilt of the appellant. In support of his position he relies on *Davis v. State,* 245 Ala. 589, 18 So.2d 282, where the Supreme Court of Alabama stated:

" . . . [T]he authorities are uniformly to the effect that it is not essential that newly discovered proof would likely have produced an acquittal. It suffices if it would, in all probability, raise a reasonable doubt as to the guilt of the defendant within the degree of culpability of which the jury finds him guilty."

■ We do not perceive the foregoing rationale to mean a probability of the jury finding just a different result, whether of a higher or lower degree of guilt. In our judgment this means that the newly discovered evidence, when taken with the other evidence presented, would probably cause the jury to acquit the defendant of the degree of guilt attributed to him in the jury's initial finding.

The trial judge here was confronted with the problem of evaluating conflicting evidence. Since he saw and heard the witnesses and viewed the courtroom drama as it unfolded before the jury and at the new trial hearing, it is our opinion he was in a better position to make this evaluation. This is a privilege appellate judges do not have, and we are not able to appraise the value of the evidence with the same degree of perception as the trial judge. *Mealer v. State,* 242 Ala. 682, 8 So.2d 178.

We cannot say what another jury would do after hearing the new evidence. Nonetheless, when it is considered in conjunction with the original evidence, a jury could reasonably find appellant was implicated in the murder. If Jennifer Worthington's testimony is believed, then a new jury could reasonably find that even though Richard Zuck did not inflict the death blows, he was the principal behind the killing.

■ The refusal to grant a new trial on the ground of insufficiency of the evidence is also a matter within the court's discretion. In *Moore v. State,* 52 Ala.App. 179, 290 So.2d 246, we read:

"In reviewing the refusal of a motion for a new trial this court will indulge every presumption in favor of the correctness of the ruling of the trial judge and the decision thereon rests largely within the sound discretion of the trial court."

■ We are convinced that the trial court was correct in denying the motion. The evidence presented was sufficient, and the verdict was in accord with that evidence.

II

During Alice Salter's testimony it was shown that Richard made this statement to her shortly after his father's death:

. . . . . .

"A. The third story was that the telephone call that he received at the Lounge was someone informing him that a certain man had arrived in town. He left to go meet this man and two other men. They went to his father's house. They wanted his father to sign some kind of paper. He said he begged his father to sign the paper, his father refused, and he left the house with one

of the men, knowing that the other two men were going to kill his father."

Prior to allowing the testimony of William Earl Salter, the trial court conducted a hearing out of the jury's presence. The State informed the court Mr. Salter's testimony was being offered to show that in December, 1973, after Mr. Zuck's death, his sister Alice told him substantially what the appellant said to her regarding his father's death. Defense counsel objected and argued this was an attempt to bolster Alice Salter's testimony by hearsay. The court overruled the objection and gave counsel an exception.

Appellant now contends this ruling was error.

We find the criticized statements in the following testimony by William Earl Salter:

.  .  .  .  .  .

"Q. (MR. WAITES) Mr. Salter, sometimes in December did you become aware of the death of Gordon Zuck?

"A. Yes, I did.

"Q. And was this occasion that your sister came to your house before or after his death?

"A. It was after his death.

"Q. All right, sir. Did she have a conversation with you about . . . concerning his death?

"A. She did.

"Q. Did she tell you---

"MR. BEDDOW: Well, we are going to object to---

"THE COURT: Don't lead---

"MR. WAITES: Well, I am . . . the point I am---

"THE COURT: Well, did she discuss that with you?

"A. Yes, she did.

"Q. Did she tell you anything that Richard Zuck had told her?

"A. Yes.

"Q. Tell us, please, sir, what she said that Richard Zuck told her about that incident?

"A. She said that the defendant, Richard Zuck, told her that there were three men in Birmingham on the day or at the time his father was killed and he believed that they were responsible for his death and he also believed that they had some connection with organized crime."

While it is true that proof of prior similar statements cannot be used to corroborate a witness' testimony, such evidence can be considered after an attempt has been made to discredit the witness by attributing her testimony to some act on the part of the person testified against calculated to excite unfriendly feelings in the witness. *Yarbrough v. State,* 105 Ala. 43, 16 So. 758.

Under the exception to this rule, evidence may be shown that at a prior time the witness made the same statement. The evidence is considered in rebuttal of the inference that the testimony was manufactured or was the result of the unfriendly act. *Yarbrough,* supra.

It cannot be disputed that cross-examination of Alice Salter indicated she was a rejected lover and her testimony might have been prompted by a feeling of bias. Based on these facts, the prior consistent statements made by this witness to her brother were admissible to show that this testimony by Miss Salter was not the product of any unfriendly feeling toward Richard Zuck.

### III

At the conclusion of the trial court's oral charge the appellant announced, "Satisfied your Honor." The trial judge then gave

**24**

thirteen written charges requested by the appellant.

 We reviewed the refused charges and found they were either covered by the court's general charge, other given charges, or were abstract, misleading or invasive of the province of the jury. In our judgment, their refusal was proper. T. 7, § 273, Code of Alabama, Recompiled 1958.

IV

 In this jurisdiction the court reporter is not required to report final arguments. T. 13, § 262, Code of Alabama, Recompiled 1958. *Browder v. State,* 54 Ala. App. 369, 308 So.2d 729.

This record was searched and no error was found.

Affirmed.

All the Judges concur.