Bobby Joe Ellenburg was charged by indictment with murder in the first degree. The appellant entered pleas of not guilty by reason of self-defense, by reason of temporary insanity, and by reason of insanity. The jury found the appellant guilty of murder in the second degree and fixed his punishment at twenty years in the penitentiary. The trial court then entered judgment in accordance with this verdict.
Patsy Holley testified that she was the daughter of the deceased, Clyde D. Morton. Holley identified State's Exhibit "B" as a work shirt belonging to the deceased.
Paul Ellenburg testified that he was appellant's brother. Ellenburg stated that on May 16, 1976, around 9:00 a.m., the appellant and his wife came to his home. According to Ellenburg, he and the appellant drank wine and beer until around 11:30 a.m., at which time the two of them left and went into the woods where they drank a half case of beer. Around 2:30 p.m., Ellenburg testified the two of them left and drove to appellant's mother's home. On the way, according to Ellenburg, they picked up the deceased, Clyde Morton. When the three of them arrived at appellant's mother's home, Ellenburg testified, he went inside, got a drink of water, and the three of them drove over to see a bootlegger where they purchased some whiskey. The appellant and Morton, according to Ellenburg, drank the whiskey.
While the three of them were driving around in appellant's car, Ellenburg testified, the appellant accused Morton of throwing his shoe out the car window. According to Ellenburg, the appellant called Morton a liar and stopped the car. The appellant and Morton, Ellenburg stated, got out of the car and Morton knocked appellant to the ground. The appellant got up, according to Ellenburg, grabbed Morton by the hair and knocked Morton to the ground. Next, the following occurred (R. pp. 341-343):
 "A. He said, `I am going to hurt him and hurt him bad.'
 "Q. He said, `I am going to hurt him and hurt him bad.'
"A. Yes.
 "Q. All right. When he was . . . talking about kicking him with his feet, did Bobby Joe have shoes on or off?
"A. No, sir, he was barefooted.
 "Q. Will you show to the jury how he was kicking or stomping?
 "A. He just had his foot up like that. (Witness demonstrates)
"Q. Had his foot up like this stomping?
"A. Yes, sir.
 "Q. And, at that time was Clyde Morton laying on his stomach?
"A. Yes, sir.
"Q. Where was he stomping him at?
"A. Below the hips.
"Q. Was he stomping him on his back also?
"A. Yes.
 "Q. Was this before or after you told him, `You are going to hurt him'?
"A. That was after.
 "Q. I will ask you if while the fight was going on if you observed anyone come by there?
"A. That Stillwell boy come by there. *Page 812 
 "Q. All right. Did you hear a conversation between Bobby Joe and Stillwell?
 "A. Bobby told him to get on down the road and stay out of it.
 "Q. Tell the jury to the best of your judgment exactly what was said.
 "A. He told him to `get his butt in that or get his ass in that truck and get on down the road.'
 "Q. And, what did Mr. Stillwell do when he told him that?
"A. He got in his van truck and left.
 "Q. All right. During the scuffle that took place, did you stay in the car or outside the car?
"A. In the car.
 "Q. Did Bobby Joe later return to the car that you were in?
"A. Yes.
 "Q. All right. Tell this jury if you will what he said to you when he got back in the car.
 "A. He said, `Well, I took his clothes. I got them one leg at a time and it didn't cost me a dime.'
"Q. What, if anything else, did he tell you?
"A. He said, `I guess I've got him.'
 "Q. `I guess I've got him.' Did he have an occasion to make a statement to you in regard to your mouth?
"A. No, sir.
 "Q. Did he have occasion to make a statement to you about keeping your mouth shut?
 "A. Yes, sir. He told me to keep my mouth shut and stay in the car.
"Q. And, did you follow those instructions?
"A. Yes, sir, that is what I did.
 "Q. You mentioned that he said . . What is that again? `I've got his pants one leg at a time and they didn't cost me a dime.'
"A. Yeah.
 "Q. When he returned to the car, what if anything did he have in his hand?
"A. He just had the clothes rolled up in a ball.
"Q. Did you have occasion to observe those clothes?
"A. No.
"Q. Did you see the clothes at any time?
"A. I just seen the bundle.
 "Q. What, if anything, did he do with that bundle of clothes?
"A. Threw them in the back seat of the car.
 "Q. What, if anything, did he do after he threw them in the back seat of the car?
 "A. He just got in the car and that is when we left from up there.
"Q. Who was driving when you left?
"A. Bobby was.
 "Q. All right. Where did he drive to from the scene where the scuffle occurred?
"A. Down to my sister, Mary's. Mary Logan's.
 "Q. Did you say anything to him while you were driving down there?
"A. No.
"Q. Did he say anything to you?
"A. No. He just said, `I guess I got him.'"
After leaving Mary Logan's house, Ellenburg testified, he and the appellant drove over to Venon Lawson's house. According to Ellenburg, the appellant took the deceased's clothes inside Lawson's house and told Lawson and his family that he must have killed Morton. The appellant and Ellenburg then left and went to pick up appellant's wife at a friend's home. After picking up Ellenburg's wife, Ellenburg testified, they drove to his (Ellenburg's) home. As they were entering the driveway, Ellenburg stated, the police drove up and the appellant ran. Ellenburg testified that appellant's knuckles on his right hand were very swollen.
James M. Buttram of the State of Alabama, Department of Toxicology, testified that he performed an autopsy on Clyde D. Morton. Buttram stated that the autopsy revealed significant injuries, such as a fractured hyoid bone, fractured ribs, cuts and abrasions, hemorrhages to the brain, and a laceration of the liver. Buttram testified *Page 813 
that the cause of death was attributable to multiple blunt force damage to the body [i.e., foot or fist]. Buttram stated that both the laceration to the liver and the damage to the neck region were potentially fatal wounds.
Donnie Richards testified that on March 16, 1976, around 10:00 or 11:00 a.m., George Rainey, Venon Lawson, Billy Loftin, Gene Pearson, and he met the appellant and Ellenburg at Lawson's house. Richards stated the appellant and Ellenburg left, but returned late that evening. The appellant, Richards testified, came in with a bundle of clothes in his arms which Richards identified as State's Exhibit "B." Appellant, according to Richards, stated that he didn't know whether or not he had killed Morton. Richards testified that appellant exhibited his hand to him, pointing out the fact that it was very swollen. During the examination of Richards, the following occurred (Vol. III, R. p. 436):
 "Q. Would you face the jury, please. Would you tell this Jury and this Court what, if anything, you said to Bobby Joe Ellenburg that night after he showed you his hand?
 "A. I asked him did he know what could happen to him for killing him.
 "Q. You said, `Do you know what will happen to you for killing him?'
"A. Yeah.
 "Q. Will you tell the Ladies and Gentlemen of this Jury what he said when you said, `Do you know what will happen to you for killing him.'
 "A. He said he wasn't worried about it that he would play crazy and get out of it."
Frank Cole, Deputy Sheriff of Walker County, testified that he found the deceased's body, nude, in a wooded area. Cole stated that he drove over to Paul Ellenburg's house and saw an automobile with three occupants inside backing out of the driveway. Cole told the occupants to place their hands on the dashboard, which Paul Ellenburg and his wife did, but the appellant ran. Deputy Sheriff Cole stated that appellant was apprehended approximately twenty-five minutes later.
Charles Binkley of the Walker County Sheriff's Department testified that he read the appellant his Miranda rights, and that the appellant stated that he understood them. Binkley stated that the appellant also signed a voluntary statement form after which he made a written confession, attaching his signature thereto. The trial court ruled that the written confession was inadmissible due to the fact that Binkley could not remember whether or not he read the statement back to appellant, word for word, before the appellant signed his name thereto.
Dr. Annette Brodsky, Associate Professor with the Department of Psychology at the University of Alabama in Tuscaloosa, testified that she was familiar with a disease known as psychomotor epilepsy or temporal lobe epilepsy. Dr. Brodsky stated that the cause of the disease can be traced to some type of organic brain damage or a blow to the head. According to Dr. Brodsky, the disease can cause a person to pass out and not be aware of his actions upon recovery. Dr. Brodsky testified that she was familiar with hypoglycemia. According to Dr. Brodsky, hypoglycemia is a medical term used to describe someone with an abnormally low blood sugar level. Dr. Brodsky testified that hypoglycemia could trigger a psychomotor epileptic attack, resulting in violent conduct. Dr. Brodsky stated that she could not unequivocally state that appellant was suffering from an epileptic condition. On cross-examination Dr. Brodsky indicated that there were "some signs of psychomotor epilepsy." Dr. Joseph Wooddial, Psychiatrist at Bryce Hospital, testified that he agreed with the testimony given by Dr. Brodsky. Also, according to Dr. Wooddial, over fifty per cent of the inmates serving sentences in state institutions are suffering from hypoglycemia. In his direct testimony, Dr. Wooddial conceded that "it was possible appellant was not suffering from hypoglycemia."
Dr. V. Delaine O'Rear testified that he was a practicing physician in Jasper, Alabama. Dr. O'Rear stated that he had two *Page 814 
interviews with the appellant, and based his testimony at trial on the results of glucose tolerance tests which were submitted to him. According to Dr. O'Rear, the results of appellant's test were not unusual. In fact, Dr. O'Rear stated that one out of five people would have test results similar to those of appellant. While, according to Dr. O'Rear, hypoglycemia "could be characterized" by "an attack" which would be accompanied "by temper tantrums and deliriums, "based upon examinations of over 300 patients over a six year period, "he had never observed this" (R. pp. 720-727).
Dr. Buris Boshell, Chief of the Division of Endocrinology and Metabolism, and Medical Director of the Diabetes Hospital in Birmingham, Alabama, testified that he had come in contact with hypoglycemia approximately five hundred times in the past twenty-five years. According to Dr. Boshell, the appellant's glucose tolerance test results were normal. Dr. Boshell's testimony was based upon figures submitted to him for his opinion, and not personal examination of the appellant.
 I
Appellant contends that the trial court committed reversible error by allowing Officer Charles Binkley to testify as to the contents of a written confession made by the appellant, even though the court had ruled the written confession inadmissible.
Officers Charles Binkley and Joel Guthrie testified that the appellant was informed of his Miranda rights and responded that he understood them, but still wished to make a confession. Binkley and Guthrie stated that no one in their presence, or to their knowledge, offered appellant any promise or hope of reward, or threatened, intimidated, or coerced the appellant in order to obtain a statement. Binkley testified that he wrote down appellant's confession as appellant talked, and that afterwards appellant signed his name to the statement. Due to the fact that the statement was not read back to appellant, word for word, before he signed it, the trial court ruled the confession to be inadmissible as evidence.
The trial court did not rule that the confession was inadmissible because it was illegally obtained. The record shows that the statement was voluntarily made after appellant had been advised of his rights. It was simply the fact that appellant did not read the statement or have someone read it back to him, word for word, that caused the trial court to rule out the statement. Officer Binkley wrote down the confession himself, and was merely using it to enable himself to testify to the facts as a matter of independent recollection. Penny v.Warren, 217 Ala. 120, 115 So. 16. Thus, no error is shown.
 II
Appellant contends that the trial court committed reversible error in denying appellant's motion for a new trial based upon several improper comments and misstatements of the evidence by the State's attorney.
During closing argument on behalf of the State, the following occurred (Vol. IV, R. p. 767):
 "Now, the best of my understanding of the defense, they hand their defense basically on . . . Well, they pleaded self-defense. I submit to you that there is no case, no evidence of self-defense."
Appellant contends that the above was a direct reference to the appellant's not testifying. Since there was no objection or motion to exclude made by the appellant, the question is not properly presented for our review. King v. State, 48 Ala. App. 154, 262 So.2d 764, cert. denied 288 Ala. 744, 262 So.2d 767, cert. denied 409 U.S. 986, 34 L.Ed.2d 252, 93 S.Ct. 339.
During closing argument, the State's attorney made the following statement (Vol. IV, R. p. 793):
 ". . . [T]hat up to fifty per cent of the people in the prisons suffer from this. According to him they should all be let out.
 "MR. WYLIE: Judge, we object to that. That is highly improper.
 "COURT: Sustained. Jury disregard the last statement." *Page 815 
The trial court sustained appellant's objection to the statement, and then instructed the jury to disregard the remarks. Therefore, the trial court took the necessary steps to remove any possible prejudicial effect the statement may have had. Thus, no error is shown. Adair v. State, 51 Ala. App. 651,288 So.2d 187; Retowsky v. State, Ala.Cr.App., 333 So.2d 193;Napier v. State, Ala.Cr.App., 337 So.2d 62.
Also, during closing argument, the State's attorney made this statement (Vol. V, R. p. 795):
 "What actually happened is we have this situation . . . it involves a mean drunk. That is exactly what happened. Bobby Joe Ellenburg drinks a lot and when he drinks a lot he becomes mean. That is exactly what happened.
 "MR. WYLIE: Judge, we are going to object to that. He can draw inferences with evidence but he cannot misstate the evidence and there has never been testimony that when Bobby Joe Ellenburg drinks he becomes mean. His mother said on the contrary when he drinks normally he went home and went to bed. Now, Mr. Baker is misstating the evidence time and time again and we are sitting here trying to listen to it and we can't stand it any longer.
"COURT: Sustained.
 "MR. LAIRD: We ask the Court to instruct the Jury not to consider that.
 "COURT: The last statement of the District Attorney is not to be considered."
As may be seen, the trial court took the necessary steps to remove any possible prejudicial effect the remarks may have had. Adair, supra; Retowsky, supra; Napier, supra. In addition, the trial court, in its oral charge, stated (Vol. V, R. p. 803):
 ". . . Statements of counsel will not be considered as evidence and I have made this statement several times and I know all jurors and parties here understand that."
Further, in argument, the State's attorney made this statement (Vol. V, R. p. 798):
 ". . . What he is asking this Court to do is to give him a license and on that license it is going to say, `To Bobby Joe Ellenburg, license to kill.'
 "MR. WYLIE: Judge, we are going to object to this. This is not proper argument.
"COURT: Sustain.
 "MR. WYLIE: We ask the Court to instruct the Jury to disregard the last statement and further instruct the District Attorney to confine his argument to that which is legal, not this illegal argument.
 "COURT: Agree. Jury is to disregard the last statement of the District Attorney."
The trial court, by instructing the jury to disregard the statement, cured any prejudicial effect the remark may have had. Fuller v. State, 269 Ala. 312, 113 So.2d 153.
 III
The State's attorney, during recross-examination of Mrs. Gladys Ellenburg, asked the following question (Vol. IV, R. p. 586):
 "Q. Do you know whether or not Bobby Joe ever received welfare payments and food stamps?
"MR. LAIRD: We object to that, Judge.
"COURT: Sustained."
As shown above, the question was not answered, and the rule is that improper questions not answered are harmless.Strickland v. State, 269 Ala. 573, 114 So.2d 407. Also, the appellant did nothing further than to object, and such objection was sustained. The appellant did not move to exclude such statement, or move for a mistrial, or invoke a further ruling by the trial court, therefore, this question is not properly presented for review. Veith v. State, 48 Ala. App. 688,267 So.2d 480; Lambert v. State, 208 Ala. 42, 93 So. 708. Thus, the trial court properly denied appellant's motion for a new trial based upon the above grounds. *Page 816 
 IV
Appellant contends that the trial court committed reversible error in allowing certain photographs of the deceased to be introduced into evidence. He asserts that the photographs did not depict any material fact in issue, were cumulative, and introduced solely to inflame the minds of the jurors, and were gruesome. We disagree. The photographs did depict the character and location of the external wounds on the body of the deceased and such were therefore admissible, even though they were cumulative evidence based upon an undisputed matter. Snow v.State, 50 Ala. App. 381, 279 So.2d 552, cert. denied 291 Ala. 798, 279 So.2d 558 (1973); Robinson v. State, Ala.Cr.App.,342 So.2d 1331 (1977); Douglas v. State, Ala.Cr.App.,333 So.2d 880, and cases therein cited.
 V
Appellant contends that the trial court committed reversible error in allowing certain articles of clothing, alleged to have been worn by the deceased, to be introduced into evidence.
The appellant asserts that the clothing had no probative value and was introduced solely to inflame the minds of the jurors.
In Harnage v. State, 49 Ala. App. 563, 274 So.2d 333, reversed on other grounds at 290 Ala. 142, 274 So.2d 352, affirmed after remand at 49 Ala. App. 751, 274 So.2d 356, cert. denied 290 Ala. 367, 274 So.2d 356, this Court, through Harris, J., stated:
 "It has long been the law in this State that the clothing of the deceased, as well as that of the accused, are admissible in homicide cases, when such objects tend to corroborate or disprove, illustrate or elucidate, any other evidence, or to identify any of the parties, or connect the accused with the crime, although such evidence may have a tendency to bias or prejudice the jury, and elicit their sympathy for, or animosity toward either the deceased or the accused. Campbell v. State, 23 Ala. 44; Teague v. State, 245 Ala. 339, 16 So.2d 877; Barbour v. State, 262 Ala. 297, 78 So.2d 328."
Therefore, the trial court did not err in admitting the items of clothing into evidence.
 VI
The appellant contends that the trial court erred in denying his motion for a new trial based upon certain newly discovered evidence.
At the hearing on the motion for a new trial, appellant's counsel called Mrs. Patricia Ellenburg, wife of appellant, to testify. Mrs. Ellenburg stated that she witnessed the beating of the deceased, and that Paul Ellenburg participated in the altercation. She stated that after the incident she left the Ellenburg family and that her whereabouts were unknown to her husband, the appellant.
The State's attorney, on cross-examination of Mrs. Ellenburg, brought out testimony contradictory to that of every witness who testified at trial.
In Veith v. State, 48 Ala. App. 688, 267 So.2d 480, we find this statement:
 "The general rule governing newly discovered evidence is to the effect that such must be shown to be unknown to appellant and could not have been discovered before trial in the exercise of due diligence. Further, that such evidence must be such as not merely cumulative or for impeachment merely, but rather must be of such nature as to be sufficient to probably change the result of the trial. Lackey v. State, 41 Ala. App. 46, 123 So.2d 186; Washington v. State, 259 Ala. 104, 65 So.2d 704; Hodge v. State, 32 Ala. App. 283, 26 So.2d 274."
We are of the opinion that the trial court properly denied the motion for new trial. Zuck v. State, 57 Ala. App. 15,325 So.2d 531, cert. denied 295 Ala. 430, 325 So.2d 539.
 VII
Appellant contends that the trial court erred by failing to instruct the jury to disregard certain illegal and incriminating evidence which had been wrongfully exhibited to the jury (Vol. III, R. p. 467). *Page 817 
The State called Officer Charles Binkley to the stand. When Binkley entered the courtroom, he carried with him two articles of proposed evidence, consisting of a beer can and a bottle of whiskey. The trial judge immediately instructed the jury to leave the courtroom. Outside the presence of the jury, the trial judge instructed Binkley to conceal the items and stated that they would be excluded. The appellant then asked for a mistrial, and the trial court denied this motion. Appellant then asked the trial court to instruct the jury, when they came back in, not to consider the two items in reaching their verdict. The trial court did not rule on appellant's request and the appellant never asked for a further ruling. Absent an objection to the lack of a ruling, we have nothing to review.Mitchell v. State, Ala.Cr.App., 338 So.2d 524; Wade v. State,49 Ala. App. 601, 274 So.2d 626.
We have carefully examined this record and find no error therein. The judgment below is
AFFIRMED.
All the Judges concur. *Page 1147