TYSON, Judge.
The indictment by the grand jury of Jefferson County charged Ruth Zuck with the first degree murder of her husband, Gordon Darnell Zuck, “by beating him with an iron bar, or by means otherwise unknown.” The jury found the appellant guilty of murder in the second degree and fixed punishment at fifteen years imprisonment in the penitentiary. The trial court then entered judgment in accordance with this verdict.
Wilma Zuck Aulsbrook testified that she was the daughter of Gordon Darnell Zuck, and that she last saw her father alive about three weeks prior to his death (night of December 4-5, 1973).
J. O. Butler, Sr., testified that, as Coroner of Jefferson County, he examined the body of the deceased and determined that the cause of death was numerous blows to the head which had caused several skull fractures. He also identified several photographs he made at the Zuck home where Mr. Zuck’s body was found on the early morning of December 5, 1973.
Flynn Jerald, a fireman with the Vesta-via Fire Department, testified that he went to the Zuck residence on 2509 Beaumont Circle, Vestavia, at 6:18 a. m., on December 5, 1973, in response to a call. He testified that he remembered seeing Mrs. Ruth Zuck in front of the house, on the steps, when he arrived. Upon entering a downstairs bedroom, he found the body of a man sitting in a chair with a black cloth draped over his head. He testified that he saw no weapon, and that he asked one of the other firemen to call the police and coroner.
Stephen Gregory Renfroe testified that he answered a call, as a member of the Vestavia Police Department, to go to the Zuck residence on Beaumont Circle, and arrived there shortly before 6:30 a. m., on December 5, 1973, accompanied by Officer Jim Minor. He testified that Sergeant Thomas Kines was already on the scene when they arrived. He testified that Mrs. Ruth Zuck asked him to notify her sons and daughters, and that “she presumed her husband had passed away.” He testified that he also talked with Mrs. Zuck’s son, Richard, that morning, and that he (Ren-froe) notified a Mrs. Deedee McDonald, a police radio dispatcher at Vestavia Hills, to notify the family. He also stated he saw the body of the deceased, Gordon Darnell Zuck, in a chair in a downstairs bedroom.
Sergeant Thomas J. Kines testified that he was a Patrol Sergeant with the Vesta-via Police Department. He testified that he arrived at the Zuck home on the morning of December 5, 1973, at about 6:25, and upon arrival, he met three members of the Vestavia Fire Department, who were paramedics, two of whom were Captain Flynn Jerald and Louis Harrison. He stated that he saw the deceased’s wife, the appellant, Mrs. Ruth Zuck, standing on the front porch, that she was not crying. He stated that he went into the room where the three firemen were and found the body of Gordon Darnell Zuck sitting in a chair in a downstairs bedroom, that he remained *779 at the scene about one hour. He also identified a diagram of the interior of the home. He stated that while he was inside the house, Richard Zuck, a son, came in and gave him permission to remove certain papers. He testified that later, after the coroner had come and examined the scene, he talked with Mrs. Zuck and told her that her husband was dead, and that “it looked as though he had met with foul play.” He testified that Mrs. Zuck then stated that she had spent the preceding night at the apartment of her son, Richard Zuck. From the record (R. pp. 61-63):
“Q As best you recall, tell us everything that you said to her and she said to you?
“A I asked Mrs. Zuck how long it had been before she had talked to Mr. Zuck or had seen him. She said she talked to him sometime between, the last time between eleven and midnight.
“THE COURT: Of the night before?
“A The night of December the fourth and the morning of December the fifth.
“Q Did she tell you where she was when she talked to him on that occasion?
“A She was at Rick’s apartment.
“Q Did she tell you whether or not she had had any other conversation with him that night before the occasion of eleven or twelve o’clock?
“A She made the statement that she had called Mr. Zuck from Maplesville on her way back from Selma.
“Q Did she tell you what time she called Mr. Zuck from Maplesville ?
“A If she did I don’t recall.
“Q Did she tell you about any other conversations that she had with Mr. Zuck?
“A She called him again in Montevallo. From Montevallo. But I don’t even recall asking her the time.
“Q What else did she tell you on that occasion ?
“A She said she had called Mr. Zuck, and told him that they had gotten some business or something straightened out in Selma and she was going to Ricky’s apartment and she would call him from there. And from her statement she said that she called Mr. Zuck again from the apartment around nine o’clock or thereabout. And she told him that she was there and they were gonna go over some business. What the business transaction was I have no idea.
“Q Did she tell you anything else that you recall?
“A That Mr. Zuck told her for her to stay on over there and for her and Richard to get together and get the business straightened out. That he would see her in the morning.
“Q Did she tell you where she spent the night that night?
“A At Richard Zuck’s apartment.
“Q Did she tell you who else was there at that apartment that night ?
“A Richard and Linda.
“Q Did she tell you anything else about Richard’s whereabouts that night ?
“A I don’t recall. I don’t recall asking her that question.
“Q Did she tell you what time Linda went to bed?
“A No sir.
“Q Did she tell you what time she went to bed?
“A She told me that she called Mr. Zuck somewhere between eleven and twelve o’clock and Mr. Zuck wanted Richard to come over and take him down to the theatre. And Richard left. Then Linda was laying on the bed in Richard’s room. And then she went in there and laid across the bed with Linda.
*780 “Q Did she tell you whether or not she saw Richard come back to that apartment that night?
“A I don’t recall her saying whether or not she did.”
On cross-examination, Sergeant Kines stated that he saw the fifteen year old daughter of the Zucks, Linda, and their fourteen year old son, Lou, both of whom were crying.
Vestavia Police Lieutenant Joe Stewart testified that he went to the home of Gordon Zuck on the morning of December 5, 1973, about 7:30, that he saw the appellant, Mrs. Ruth Zuck, and her daughter, Susan Morton, in the kitchen of the residence. He also stated that a Mrs. McDonald, who was a radio dispatcher for the Vestavia Police Department, and a Mrs. Sanders, a neighbor, were also there. From the record (R. pp. 69-70):
“Q What did you do there in the kitchen?
“A I asked Mrs. Zuck what had happened.
“Q What did she tell you ?
“A She stated that Gordon had hemorrhaged again and was dead.
“Q What did you say to that? Anything ?
“A I asked her how she had discovered the body and so forth and she said that she and Linda had been out of town for about the last four days from the previous Thursday and that they had come home that morning at about six-fifteen a. m.
“Q They who?
“A Mrs. Zuck and Linda.
“Q Did she tell you where she had spent the night?
“A She had spent the night at her son, Rick’s apartment at The Club Apartments.
“Q Go ahead.
“A That they had arrived at the Zuck residence at approximately six-fifteen a. m. and had brought a load of luggage into the house and Mrs. Zuck said that she went into the kitchen and that Linda had gone into her bedroom.
“Q Her who?
“A Linda’s bedroom.
“Q All right go ahead.
“A Mrs. Zuck stated that she called to. Linda to go get her daddy to help unload the car. She said that Linda went into her daddy’s bedroom and came screaming back down the hall shouting mother something’s happened to daddy. Mrs. Zuck stated that she then ran down the hall to Mr. Zuck’s bedroom door and saw him sitting in a chair there covered with blood. She stated that she told Linda to go wake up Lou, her son.
“Q Did she tell you whether or not she went into that room?
“A She said she took one step into the room.”
She stated that her daughter, Linda, went in and woke up her young son, Lou, and that he ran from the house to the home of a doctor friend, crying. He further testified that Mrs. Zuck stated she had been to Selma the previous day with her daughter, Linda, and that she had been in telephone contact with her husband several times that day (December 4, 1973). She stated that she had advised her husband by phone that they were leaving Selma after taking care of some business with the family theatre, and that she had also talked with him by phone from Ma-plesville and Montevallo en route home. She stated that she reached Birmingham and went to her son’s, Rick’s, apartment about 8:30 that evening. Mrs. Zuck further stated that she and her son, Rick, then went to the Rodeway Inn to get something to eat, and that her son dated a girl by the *781 name of Alice Salter, who was employed in the Lounge at Rodeway Inn. She stated that upon arrival at Rodeway Inn, her son asked Alice to accompany them when she got off work. She stated she telephoned her home from there and that Mr. Zuck told her to go ahead and spend the night at her son’s apartment and to bring the business papers over the next morning. She further stated that after arrival at her son’s apartment, Alice Salter came by, shortly after 12:00 p. m., and that her daughter, Linda, was asleep on the couch when she came into the apartment. He stated that Mrs. Zuck told him that she telephoned her husband from the apartment and told him that she would be over the first thing the next morning, that she, her daughter, Linda, and Alice Salter sat up and talked. She stated that Linda went to bed after a while. From the record (R. p. 75):
“Q On the morning of December five when you talked to Mrs. Zuck or that night of December Five when you talked to her, did she make any mention to you about the business, the family business?
“A She said the business was in some difficulty and they had quite a few bills that were past due and that she had brought back some money from Selma on this trip she had been on and that Mr. Zuck in one of her phone calls had instructed her to go to Rick’s apartment to determine, she was bringing some money back, but it wasn’t enough to cover all the bills and to go to Rick’s apartment and decide who to pay and who not to pay out of this money.
“Q Did she tell you anything about Mr. Zuck’s condition and about his whereabouts three or four days before his death ?
“A Yes sir. She said that Mr. Zuck was in bad health and that he had withdrawn and that creditors were hounding him and he wouldn’t answer the phone and so forth and that he hadn’t been out of the house and wouldn’t leave the house in over a week prior to his death.
“Q When you saw Mrs. Zuck that morning of December five was she crying ?
“A No sir.
“Q Was Linda crying?
“A Yes sir.”
Morton Hall testified that he delivered newspapers for the Birmingham Post-Herald on Beaumont Drive and Beaumont Circle in Vestavia. He testified that about 2:25 a. m., he was delivering newspapers on Beaumont Circle and saw Richard Zuck standing in front of the Zuck residence. He testified that he delivered the rest of his papers and then completed his route by going by Vestavia City Hall, and arrived there about 2:50 a. m., where he saw Mrs. McDonald, the police dispatcher.
Jennifer Worthington testified that she was formerly employed as a secretary by Mr. and Mrs. Gordon Zuck. She testified that Mrs.' Zuck had interviewed her, and that she worked at the offices of Jerry Lewis Cinema Theatre in Vestavia. She testified that in addition to handling secretarial duties for both Mr. and Mrs. Zuck, she occasionally did typing for their daughter, Susan Morton, and their son, Richard Zuck.
She testified that she had previously plead guilty to the murder of the deceased, Gordon Zuck, and was presently incarcerated at Tutwiler Prison for Women in Alabama. She testified that about two or three days before the Alabama-Auburn Football Game that fall (December 1, 1973), she had a conversation at the thea-tre office with Richard Zuck, Susan Morton, Joan Farris and Jackie Farris. From the record (R. p. 101) :
“A At that time Rick and Jackie were talking about Mr. Zuck and how they thought that he could be killed. At this *782 time they were talking about chloroform while he was asleep.
“Q Did you enter into that conversation?
“A No. But I was sitting there -while they were talking about it.
“Q Was that also in the presence of Susan Morton and Joan Farris ?
“A Yes it was.
“Q Did they say anything along that line?
“A No sir.
“Q How long did this conversation last, the part about the chloroform ?
“A About fifteen minutes.
“Q Do you recall the night of December four and December five of 1973?
“A Yes sir.
“Q And at that time were you employed in the Zuck business ?
“A Yes sir.”
Jennifer Worthington further testified that about a week prior to Mr. Gordon Zuck’s death, she had a conversation with Richard Zuck about the family’s business, and that Richard told her the business was in great financial trouble, that his mother, Ruth Zuck had some checks outstanding, and that they could not get the money from his father to cover these. From the record (R. pp. 103-104) :
“A He told me that affairs hadn’t been going very well and the business deals were messed up by Mr. Zuck because he wouldn’t go along with them. So the business, he thought, was going to go into bankruptcy because they needed the money and they needed it, you know, now, not later. And that his mother had written some checks that couldn’t be covered and that Mr. Zuck would not give her the money, and he was afraid that they were going to bounce and she would have some trouble.
“Q Did he say what would have to be done to straighten this matter out ?
“A He told me at that time that he thought Mr. Zuck was going to have to be killed.
“Q Now, on Saturday night before December four and December five, did you see Richard Zuck ?
“A Yes I did.
“Q Where?
“A At his apartment.
“Q Who else was present, if anybody?
“A No one.
“Q Did you have some conversation with him at that time ?
“A Not pertaining to Mr. Zuck, but I was with him for approximately an hour.
“Q Did you get any money from him that night ?
“A Yes I did.
“Q How much ?
“A Two hundred dollars.
“Q What did you use that money for?
“A For an abortion.
“Q And when did you have an abortion?
“A On the third.
“Q What day of the week was that? “A Monday.
“Q On that Monday after you went to the doctor, at any time during that day or night did you have a conversation with Richard Zuck ?
“A Yes I did.
“Q What did he say to you and what did you say to him ?
*783 “MR. WILKINSON: We object again, same grounds.
“THE COURT: Overruled.
“MR. WILKINSON: Except.
“A After I came home I called him at approximately six-thirty.
“Q Where did you call him ?
“A At his apartment.
“Q What did he say to you and what did you say to him ?
“A I just told him that I was back home and that I was all right and he said then the same thing that he had told me in essence a week before that he was upset about his family and they were having great financial trouble and that he had decided that then his father had to be done away with.
“Q Did he say anything about the checks on that occasion ?
“A Yes he did. He mentioned his mother’s checks again and said that he thought they had gone through the bank and they wouldn’t clear.
“Q Did he talk to you on that occasion about killing Mr. Zuck ?
“A Yes he did.
“Q What did he say ?
“A He asked me at that time if I knew anyone and I told him I didn’t but I was sure that if he wanted someone, someone could be found.
“Q What did he say to that ?
“A Well, he said it would be worth twenty-five thousand dollars.”
Mrs. Worthington further testified that this conversation took place on Monday night, and that she would be paid from insurance monies received by his mother from the estate. She further stated that the next afternoon she saw Richard Zuck again in the office about 2:00 p. m. On this occasion Richard Zuck stated that he was offering $25,000, and that something had to be done immediately. She testified that she later talked with him by telephone about 7:00 that evening. She stated that in the meantime, she had talked with Jackie Farris about 4:00 that same afternoon, and that in her conversation with Jackie Farris, he stated (R. pp. 106-108):
“A Jackie told me that he had spoken with Rick about this for himself and wanted to know if he had said anything to me about it, and I told him yes he had. Jackie said that he had told him that it was worth twenty-five thousand dollars and Jackie said that that kind of money would be nice for both of us and I said yes and we dropped it at that. It went no further.
“Q Did you talk to Richard Zuck by phone or in person at seven o’clock ?
“A That'was by phone.
“Q Did you call him or did he call you?
“A I called him.
“Q Where were you when you called him?
“A I was at my apartment and I called his apartment.
“Q What was that conversation? What did he say to you and you say to him?
“MR. WILKINSON: We object. Same objection.
“THE COURT: Overruled.
“MR. WILKINSON: We except.
“MR. WAITES: Go ahead.
“A When I called I was just talking to him about anything and everything, and he started on the finances again.
“Q What did he say about them ?
“A He said something had to be done that night. That if it wasn’t the whole *784 business was going into bankruptcy and there wouldn’t be any money at all.
“Q Did he propose what had to be done?
“A He said his father had to be killed. And he asked me if I knew anybody or if I would be willing to do it for him, and I told him that I would help him but I didn’t know anybody else other than Jackie Farris. And I told him that I would have to call Jackie and I didn’t know whether he would or not.
“Q Did you call Jackie?
“A Yes I did.
“Q What did you say to Jackie and what did he say to you ?
“MR. WILKINSON: Same objection.
“THE COURT: Overruled.
“MR. WILKINSON: Except.
“MR. WAITES: Go ahead.
“A I called Jackie at the theatre about eight or eight-thirty and told him that I had talked to Rick and that Rick wanted me to talk to him about his father and Jackie said that he would come to my apartment when he got off work, for me to call him and give him directions. So at approximately between nine-thirty and ten I called Susan Morton’s house, she answered the phone, and said that Jackie wasn’t there, but while I was talking to her he came in and I talked to him and gave him directions how to get to my house.”
She testified that she went and picked up Jackie Farris after talking with him at Susan Morton’s house, and that she and Jackie then went back to her apartment about 10:30 that evening. She testified that about 11:00, she telephoned the Rode-way Inn and talked with Richard Zuck, that he told her he would meet them at the Pancake House in Vestavia, and he would tell us what to do. She testified that Richard Zuck came alone to the Pancake House, that they sat in a booth and discussed the matter. From the record (R. p. 110):
“A Rick came in and sat down with us and told us that he wanted us to go to the house, later, he had to go back over several times to. see his father. That he was going to work out all the details and that we would go there that night and kill him, kill his father.”
She further testified that Richard Zuck told them to next meet him at the Dobbs House in Homewood, and they so agreed. She further testified that while at the Pancake House, she had given some pills to Richard which she had obtained from her doctor, they were to be used as pain pills. She stated that Richard told her he would put these in some hot chocolate and give them to Mr. Zuck (R. p. 111).
She stated that later Richard Zuck met her and Jackie Farris a' second time at the Pancake House, and that on this occasion he gave them a key to the Zuck home, and told them that his father was there alone, and when they got through to telephone him at his (Richard’s) apartment. She said that he further told her that she and Jackie would both be richer by $12,500 each (R. p. 112).
Mrs. Worthington further testified that early that morning she and Jackie Farris drove to the Zuck home on Beaumont Circle in Vestavia and opened the door with Jackie entering first. She stated that he carried a tire tool, which he brought from his automobile, that they entered from the basement stairs to the hallway upstairs, and then walked down the hall to Mr. Zuck’s bedroom. She stated that the bedroom was down the hall on the right. From the record (R. pp. 114-116):
“Q Who went in the bedroom first?
“A Jackie.
*785 “Q What happened when you got inside the bedroom ?
“A We went inside the bedroom and Mr. Zuck was in the chair and he started to get up and he said something to Jackie and. Jackie hit him and he fell back in the chair and I turned around and closed the louvered doors.
“Q Tell me where there are some louvered doors please ?
“A As you first go into the bedroom there’s a big door.
“Q From the hall entrance ?
“A Yes.
“Q Dressing room ?
“A Ah ha. Then there’s louvered doors past the big door.
“Q From the dressing room into the bedroom ?
“A Right.
“Q Can you see this (indicating diagram) :
“A Ah ha.
“Q Would the louvered doors be here (indicating) ?
“A Right there.
“Q This is a solid door (indicating) ?
“A Right.
“Q Which door did you close ?
“A The louvered doors.
“Q After Jackie hit Mr. Zuck what happened ?
“A I closed the doors and I went around on the other side, around the chair. I hit him two or three times and Jackie hit him again. After that we left.
“Q Did you or Jackie take anything with you from that room ?
“A Yes.
“Q What?
“A The tire tool, billfold and rings.
“Q Whose billfold?
“A Mr. Zuck’s.
“Q Who got the billfold ?
“A Jackie.
“Q Who got the rings off his fingers?
“A Jackie.
“Q Did you see anybody else in the house that night?
“A No.
“Q How long did you and Jackie remain in that room ?
“A About ten minutes.
“Q When you left the bedroom did you leave the house ?
“A Yes we did. The same way we came in.
“Q Did you leave in Jackie’s car ?
“A Yes we did.
“Q Where did you go?
“A To my apartment.
“Q What did you do when you got to your apartment?
“A Called Rick.”
She stated that after she and Jackie returned to her apartment they telephoned Rick at his apartment, and then each proceeded to take a bath. She stated that she took some clothes to the laundrymat and washed them. She testified that she next saw Richard Zuck at the home of Susan Morton on Thursday night, December 6, 1973, and that she saw Mrs. Zuck on Friday night, December 7, 1973, at Richard Zuck’s apartment, which was after the funeral, that there were a number of people there. She stated that later she telephoned Mrs. Zuck, that Mrs. Zuck said she had been by City Hall, and that some question *786 ing had taken place, but that she did not have to go back the next day to take a lie detector test if she did not wish to. She stated that Mrs. Zuck told her she would give her two weeks’ pay and to take her, Mrs. Zuck’s, family station wagon and go to Selma to work at the family theatre there. She stated that Jackie Farris brought the Zuck family station wagon and picked her up, that they went to see Mrs. Zuck, that they left the next morning and went to Selma where she registered under the name of Ann Green at a motel. She stated that she remained in Selma, but that she did not go to work again until March, 1974, when Mrs. Zuck employed her as a secretary to keep the books and records for the family business in Selma. She stated that on two or three occasions that spring, Mrs. Zuck spoke about her husband’s death with the idea that she was concerned about Rick, but she stated that she did not think he would be convicted, referring to his coming trial. She stated that shortly before Rick’s trial, she told Mrs. Zuck that she needed an automobile, and that Mrs. Zuck purchased a 1967 Cadillac, that she, Jennifer Worthington, went to the bank and obtained a loan, and that Mrs. Zuck cosigned the note at the bank. She stated that she received the automobile on Friday before Richard Zuck’s trial, which commenced the following week. She stated that on June 14, 1974, during the trial of Richard Zuck, she received $350.00 from Susan Morton. This check was identified and placed in evidence. She stated that this was for some repairs which were done on her automobile. She stated that she later saw Mrs. Zuck again at the Ramada Inn Lounge on June 18, 1974, and then went to Selma, where she was arrested.
Mrs. Worthington testified that she struck Mr. Zuck three times on the early morning of December 5, 1973, with a tire tool after Jackie Farris had first struck him, and that she received a sentence of twenty years after pleading guilty for this offense.
W. J. Underwood testified that he was a Deputy Sheriff with Jefferson County. He testified that he also worked in his off-duty time as a security man at the Rodeway Inn on Oxmoor Road in Homewood. He testified that he was on duty on the night of December 4, 1973, and saw Richard Zuck in the lobby and talked with him. He testified that later Richard introduced him to Mrs. Zuck, and that she had just gotten off the telephone. From the record (R. p. 135):
“Q Where was she?
“A On the phone in the lobby.
“Q When she came up to you what was said?
“A The first statement she said was ‘Damn, its hard to get rid of the old man.’ Something along those lines.”
He stated that it appeared both Richard and his mother had been drinking.
Alice Salter testified that she was an employee of the Rodeway Inn at Oxmoor Road in Homewood in November and December, 1973. She further testified that she had an apartment, which was located directly below the apartment of Richard Zuck, and that each of them lived alone at this time, that Richard often times stopped by the Rodeway Inn Lounge to have a few drinks, and occasionally he would eat with her when he was off work. She testified that on Tuesday, December 4, 1973, Richard Zuck came by her apartment and made several phone calls about building a new theatre. He had stated that he needed some franchise money. She stated that after going to work, she saw him about 8:30 that evening at the Rodeway Inn Lounge, and that he brought his mother, Ruth Zuck with him. She stated that she served each of them drinks, that Richard drank Canadian Club and Seven-Up; and Mrs. Zuck drank Old Forrester and Ginger Ale. She stated that Richard Zuck left the Rodeway Inn, saying that he was going by *787 his apartment, that Mrs. Zuck stayed there and had another drink and a sandwich while he was gone. She stated that he then returned and came up to the bar where she was working and told her he was expecting a phone call and to please get him when it came in. She stated that after a few minutes he answered the phone, and after this conversation, he turned around to her and stated: “Alice I got the money I needed but you’re going to hate me when you find out how I got it.” (R. p. 144) She said “What do you mean?” He stated, “Bring me another drink and a cup of coffee.” She stated that during the evening Richard Zuck had either three or four drinks, and Mrs. Zuck had three. She said that later that evening, she had a conversation with Richard Zuck on the telephone and, that he told her, “Alice daddy is dead, meet me at the apartment when you get off and I'll explain it later.” She said that she' did not see Richard again until about 6:00 the next morning, December 5, 1973. She testified that after getting off work, she went by Richard’s apartment, and that Mrs. Zuck and Linda, his sister, were there. She stated that Linda was asleep on the couch. She testified that Mrs. Zuck told her to get up, that she wanted to introduce her to someone. She testified that she remained at Richard Zuck’s apartment until about 3:00 in the morning, and that she last saw him around 6:00 in his apartment. She stated that later Mrs. Zuck came back to Richard’s apartment and that she had been fixing some coffee, that Mrs. Zuck and her daughter, Linda, and two other daughters had gone over to Richard’s apartment at that time. She stated that later that day, Lt. Stewart had talked with her and asked her what time she got home, and she had told him about ten minutes after two. She stated that he asked her what time Richard Zuck got home, and she said she was not sure, and that Mrs. Zuck was trying to say to her in a whisper voice, 2:15, 2:15 (R. p. 154). She testified that she left her job at Rodeway Inn the next week and took a job working for Mrs. Zuck, Susan, and Rick at the theatre; and that during this time Mrs. Zuck stayed at Rick’s apartment until she got an apartment of her own at The Club Apartments in Birmingham. She stated that she continued to date Richard Zuck until about a week before his trial on June 10, 1974.
Frank Meadows testified that he had been employed by the Zuck family in Birmingham. He testified that three or four months prior to November, 1973, he thought during July, he had a conversation with Mrs. Zuck and her daughter Susan Morton, at the theatre in which “They offered me $500.00 if I could find somebody to knock Mr. Zuck off.” (R. p. 164) He stated that the following Sunday morning, he met Mrs. Zuck at the Country Club, and that she told him to “forget it.” She stated, “We’ll handle it ourselves.” (R. p. 165) He testified that he worked for the Zucks for about six months at their Birmingham theatre.
Shawn O. Spencer testified that he lived in Selma, Alabama, during the summer of 1973, and that while working for Mrs. Zuck, he approached her as follows (R. pp. 191-192):
“A The conversation I had with Mrs. Zuck was, I asked her what she would do if one of her friends approached her and asked her to hurt another friend or to go as far as to kill a friend of hers.
“Q What did she say to that ?
“A The first thing I believe she said was, ‘It sounds like Frank Meadows.’
“Q What did you say to that?
“A I said no it’s not Frank.
“Q What else was said ?
“A Then she went in to tell me that Frank and Mr. Zuck hated each other, and that it sounded like something he would do. I went ahead and said well it was Frank and she said well I wouldn’t *788 take it too seriously because one of Mr. Zuck’s cousins or brother-in-law or something was a high ranking official with a law enforcement agency, I believe it was the FBI, I’m not sure, and no one would be so stupid as to do this so, you know, I dismissed this.
“Q Did you tell her what Frank Meadows said to you in that conversation?
“A None other than Frank asked me about killing'someone and, this has been some months ago, but I believe I did go as far as to say it was Frank and Mr. Zuck Frank was talking about.”
Ida Richardson testified that she lived in the Penthouse Apartments in Birmingham on December 4, 1973. She testified that she met Richard Zuck around the first of November, 1973. She testified that -she met Richard’s mother, Mrs. Zuck, on Thanksgiving day at the Vestavia Country Club. She testified that on the night of December 4, 1973, she had a telephone conversation with Rick and his mother at his apartment shortly after 8:00 p. m., and that in this telephone conversation, Mrs. Zuck stated that Mr. Zuck “had been giving her some problems,” and that “she would be better off if she were rid of him.” She further said that Mrs. Zuck stated, “We will get together next week and celebrate.” She asked her what they would celebrate, to which Mrs. Zuck replied that she didn’t know, but she would find something to celebrate about (R. p. 194).
Kenneth Mudd testified that he was employed by Tillman Realty Company in Homewood, and that in November, 1973, Richard Zuck came by and told him that he was looking for an apartment, that later in a conversation with Richard Zuck and Mrs. Zuck concerning renting an apartment, Richard Zuck told him he would need one for his mother. Mr. Mudd stated that he next saw Mrs. Zuck on Friday evening following her husband’s funeral, and that she went to look for an apartment and that he showed one to her (R. p. 200).
Thomas Lineburger testified that he was a Certified Public Accountant with offices in Birmingham. He testified that for several years he had prepared the tax returns for several corporations in which the deceased, Mr. Gordon Zuck, was an owner. He testified that he prepared the Florida tax return for Dar-Jan, Inc., a Florida corporation, and for Automated Theatres, or Jerry Lewis Cinema, the name of the operating company with offices in Vesta-via and Homewood. He testified that this corporation had an operating loss from October 10, 1971, through December 31, 1973, of $74,897.82. He said that an interim statement for the period September 1, 1973, through December 31, 1973, showed a loss for that period of $19,695.11. He stated that Mr. Zuck owned 90% of the stock of Dar-Jan, Inc., and 50% of the stock of Automated Theatres. He testified, on cross-examination, that there had been occasions while visiting his offices when Mr. Zuck hemorrhaged extensively, and it took some time to stop the bleeding.
Frank Meadows was recalled to the witness stand and testified that he had worked for Mrs. Zuck for about four or five months in Selma before coming to Birmingham, and that he had been out with her and members of the family to discuss business matters. He testified as to one occasion on Saturday evening when Mrs. Zuck stated that she was trying to get papers signed declaring Mr. Zuck to be mentally incompetent, and that her daughter, Susan Morton, said, “I wished he was dead and we was rid of him.”
Captain Bill R. Myers testified that he was a Police Captain in charge of homicide with the Birmingham Police Department. He testified he had participated in the investigation of the death of one Gordon Zuck. He testified that he arrested that appellant, Ruth Zuck, and that Police Chief Catón and Lieutenant Spivey were *789 with him. He testified that prior to any conversation with Mrs. Zuck a full Miranda warning was given to her, and that there were no threats, promises, or other inducement, or any type coercion, made in order to obtain a statement from her.
Cecelia Ammons testified that she was employed at the Jerry Lewis Cinema in Selma, Alabama, as an employee of Mr. and Mrs. Zuck. She stated that Mr. Zuck telephoned the theatre from Birmingham at least three times on the evening of December 4, 1973. She stated that subsequently she had testified during the trial of Richard Zuck, and thereafter she had had a conversation with the appellant, Ruth Zuck, pertaining to the telephone calls. She stated that Mrs. Zuck had informed her that she had the phone bill, and that she was mistaken about Gordon Zuck calling the Theatre on the night of December 4. She stated that Mrs. Zuck told her that she had some antiques that she wished to share with her. She also told her that she was going to give her a roll-top desk.
Jack Porterfield testified that, as an attorney in Birmingham, he represented Equitable Life Insurance Society. He testified that the deceased, Gordon Zuck, had taken out several policies with this company, that death claims had been filed with the company, and that the proceeds of these had been paid into the United States District Court in Birmingham for distribution pending the outcome of some litigation, less some funds paid directly to City National Bank. He stated that about $26,000 had been paid into Federal Court, which was after paying $7,900 to the bank. Mr. Porterfield then gave the names of all of the Zuck children and adopted children (R. p.224).
Jennifer Worthington was then recalled, and said that she had seen Mr. Gordon Zuck hemorrhage from the nose and mouth when he was at work at the office.
Steve Joseph Kinner testified that he lived in Selma, Alabama, and that on one occasion in June, 1974, he had been present at the home of Jennifer Worthington when Mrs. Zuck came by to pick up Jennifer’s children. He said Mrs. Zuck made the statement in his presence that she knew that Jennifer Worthington had killed Mr. Zuck (R. p.229).
Ray Mahon testified that he was employed by Provident Life and Accident Insurance Company in Chattanooga, Tennessee, and was responsible for the claims filed with this company. He testified that the deceased, Gordon Zuck, had four policies with this company; that one for $40,000 was paid up; the total being for $33,704.20, with the beneficiary being the appellant, Ruth Zuck, that its proceeds had been paid to the assignee, City National Bank of Birmingham; that a second policy for $25,000 had been paid up in the amount of $24,877.77, that Mrs. Zuck was also the beneficiary, and that the proceeds had been paid to the assignee, City National Bank of Birmingham.
Mr. Mahon further testified that another policy in the face amount of $100,000 had been paid in the amount of $75,817.33, with the beneficiary being Dar-Jan, Inc., and that the cancelled check had 'been endorsed Dar-Jan, Inc., by Ruth Janet Zuck, Secretary. He stated that the fourth policy was for $5,000, and had been paid to Mr. Zuck’s daughter, Wilma Aulsbrook, his oldest child.
Louis Gordon Zuck testified that he was fifteen years of age and was the adopted son of Ruth Zuck, and the deceased, Gordon Zuck. He testified that Mr. Zuck was his natural grandfather, and that his natural mother was Mr. Zuck’s oldest daughter, Wilma Aulsbrook. He testified that he had a natural sister, Linda, and that the four older children, David, Sandra, Rick, and Susan Zuck Morton, were the natural children of the appellant, Ruth Zuck, and Gordon Zuck. He testified that in December, 1973, he had been employed at the Jerry Lewis Cinema, and that when he got off work at 9:00, December 4, Jackie Far- *790 ris had driven him to the home of his father, Gordon Zuck, between 9:15 and 9:30 p. m. He stated that his father was the only one at home when he came in, that he went to bed between 11:00 and 11:30. He testified that he had been asleep for some time and was awakened by screams, that he got up, ran down the hall, looked at the clock, that he thought it was either three or four o’clock in the morning, ran on down the hall toward his father’s bedroom and saw his father seated in a reclining chair, that Jennifer Worthington was standing on the other side hitting him with an iron rod. Jackie Farris was also standing over him, near the dressing room. He said that Jackie Farris spoke to him and said, “Lou go back to the bedroom and stay there.” (R. p. 239) He testified that he went back to his bedroom, locked the door and got in bed and cried. He testified that the next morning he saw his mother and sister, that someone asked him to go down the street and get a doctor, and he ran down the street and got Dr. Randle, a neighbor, to come to the house.
On cross-examination, he testified that he did not tell anyone about what he had seen until the time of his brother’s Rick’s, trial the following June. He testified that he told his mother, the appellant, Ruth Zuck, about this on the day Rick was convicted, and that Mrs. Zuck had told him, “Wait a minute, let’s call the lawyers.” He testified that they were staying at the Kahler Plaza Hotel in Birmingham at this time, and Attorneys Roderick Beddow and Fred Erben, who had been defending Richard Zuck, came over. He stated that he told them the same story on June 14, 1974, that this was after the verdict in Rick’s case had come in.
At this point, the State rested, and the appellant moved to exclude the State’s evidence, which was overruled (R. p. 249).
At this point, a stipulation was placed in evidence, which indicated the total assets of the Zuck estate was $67,000 cash in the bank, plus some Georgia Real estate, and that there were claims for approximately $350,000 from creditors.
The appellant, Ruth Janet Zuck, testified that she was fifty-four years old, and was at the time of her trial residing at Crest-wood Drive in Selma, Alabama. She testified that she and the deceased, Gordon Zuck, had four natural children, David Zuck, Richard Zuck, Sandra Weigand, and Susan Morton, who was divorced. She testified that she and the deceased had adopted two grandchildren, Louis Gordon Zuck, age fifteen, and Linda Ruth Zuck, age seventeen. She testified that the two younger children had been living with her, but that Linda was presently in her freshman year at college. She testified that her husband, for a number of years, had a steel pail manufacturing firm, and that she had been in the employ of this company for a number of years after her children were born and had begun to grow up. She stated that she had been actively employed in the family business. She testified that until about 1970, Mr. Zuck had been a very active business man, but that he began to have health problems, so they sold their last steel container plant, and had moved to Fort Walton, Florida. She testified that in 1971, she and her husband bought the franchise of Jerry Lewis Cinema and opened one in Selma, and another in Ves-tavia here in Birmingham. She testified that the Dar-Jan, Inc., was a corporation which her husband owned 90% of the stock and that she owned 10%. She said that of the proceeds of the life insurance, $100,000, which was payable to the company, $67,000 had been used to pay off a loan and debts, and the remaining $31,000 she had kept. She testified that during 1971, her husband’s physical abilities had begun to diminish, and that he was troubled by hemorrhaging, and that on occasions his memory was faulty. She said that during this period he began to curtail his business trips, and that, together with her daughter, Susan, she traveled over the seven southern states, selling the Jerry Lewis Cinema franchises. She testified that in January, *791 1973, her husband, Gordon Zuck, had given her a general power of attorney,, under which she had complete authority to handle his business affairs. A copy of the power of attorney was placed in evidence (R. pp. 257, 258). She testified that her usual routine had been to go to Selma each week, and then over to Livingston, during the fall of 1973, as they were building a theatre there. She testified that she had several conversations on December 4, 1973, with her husband by telephone, and that at one point he had suggested that she and her daughter, Linda, stay there rather than go to Birmingham because of bad weather.
Mrs. Zuck stated that on her return, she stopped both in Maplesville and Monte-vallo to use the telephone to call her husband, and that he had told her to go to her son’s, Rick’s, apartment and call him from there. She testified that she arrived in Birmingham about 8:00 that evening and telephoned her husband, and after explaining that they had not had dinner, and that her son had offered to take her to get a bite to eat, that she was going to go with him and let her daughter, Linda, remain at Rick’s apartment while they were gone.
She testified that her husband asked her to get the business papers together and bring them over the next morning. She said she told him she would, and that she would call him from the restaurant where she was going to have dinner. She stated that she and her son, Rick, went to the restaurant and lounge at Rodeway Inn on Ox-moor Road and that her son’s girl friend worked there, her name being Alice Salter. She testified that she had two drinks, ate a turkey and lettuce sandwich, and then drank a cup of coffee. She said that she chatted with Alice Salter and told her that Linda had remained at Rick’s apartment, that they had to go back to Rick’s apartment and go over some business papers. She testified that they left the motel about 11:30, and that she telephoned her husband before leaving Rodeway Inn. She testified that she spoke to a security guard, who was introduced to her by her son, and that there was some mention made about horses, that her family enjoyed riding. She testified that she arrived at her son’s apartment shortly before 12:00 p. m., and telephoned her husband again. She said that she told him that Linda was resting and watching television, and that her husband suggested that they spend the night at Rick’s apartment, then come over the next morning. She testified that she had a telephone call at the apartment from Deputy Sheriff Jarred in Selma, and that her daughter Linda, and her son, Richard, also spoke to him, that they were discussing the sale of the Livingston, Alabama, theatre. She testified that she dozed off to sleep, and a little after 2:00 a. m., Alice Salter came in and shook her, then asked if there was anything she could do for her. She testified that she telephoned her husband again, telling him that she would be over the first thing the next morning. She stated that she and her daughter, Linda, went to sleep, and about 6:00 the next morning they were awakened by an alarm clock. She testified that they then drove to their home and entered, that they found Mr. Zuck sitting in a chair in the bedroom. She asked her children to call a doctor and to notify the rest of the children. She said that she left her home about 9:00 a. m. and returned to Rick’s apartment to look over some business papers.
She denied that she ever plotted or planned with anyone to injure or kill her husband, and that she never planned with Jackie Farris, or Jennifer Worthington, or anyone else, to kill her husband, Gordon Zuck. She stated that she had awakened her young son, Lou, that morning, and asked him to go over to Dr. Randle’s house, that “daddy was bleeding again.” She stated that Dr. Randle told her, after he had examined her husband, that he had hemorrhaged to death. She said that later that morning, the coroner came in and told her that he felt that her husband had met with foul play. She testified that she had been planning to move into an apartment *792 with her young child prior to her husband’s passing, and that she did take a three-bedroom apartment in the Club Apartments, and stayed there during part of 1974. She testified that the law firm of Beddow, Embry and Beddow had represented her son, Richard Zuck, at his trial in 1974, and he had received a forty-year sentence on June 14. She testified that on going back to the Kahler Plaza, where they were staying, her young son, Lou, told her that he had seen Jennifer Worthington and Jackie Farris, that she immediately notified her attorneys, Mr. Roderick Beddow, Jr. and Mr. Fred Erben, to come over, and that they did so.
Mrs. Zuck testified that she had never had a conversation with Frank Meadows in 1973, when she allegedly offered him $500 to get someone to “knock off her husband.” (R. p. 284) She said that she had cashed a check from time to time for $200 to $300 and would give the proceeds to Miss Worthington, as Secretary, to pay certain bills for the business. She testified that, with reference to her conversation with Lt. Stewart, she thought he was asking what time her son’s girl friend had come over, and she whispered 2:15, that that is what she remembered because she had awakened her.
On cross-examination, Mrs. Zuck testified that they were “selling theatre franchises in the southeast,” and that her business was not in financial difficulty, but that they had made a small business loan in 1973. When confronted with the CPA’s statement, Mrs. Zuck simply answered, “I don’t know,” referring to the loss statement in 1973. She testified that she did remember one check, which was over $500, being returned by the bank, but that she could not remember the amount. She denied having a telephone conversation with Ida Richardson, though she said that she had seen her at the Vestavia Country Club. She also denied ever having gone out with Captain Jarred of the Selma Sheriff’s Department, or that she had ever given him a gun or a boat. She testified that Rick had gotten out of the Army in the fall of 1973, and had come home to help sell franchises. She testified that she had talked with Captain Jarred in Selma, but she did not remember talking a total of 104 minutes, and that her son and daughter had also spoken with him. She also denied offering Mrs. Ammons some furniture. She also denied telling Lt. Stewart, on the morning of December 5, 1973, that her son, Richard, had come home about 2:15 that morning. She said that she had been told by one of the police officers that the newspaper man had seen her son, Richard, near her home, but that she did not remember telling the coroner, or the police lieutenant, or anyone else, that he came in about 2:15 a. m. Mrs. Zuck also testified that she had had nurse training in college and had worked around a clinic for some doctors prior to her marriage. She said that she had taken her husband to several physicians, and that there was nothing that could be done for his hemorrhaging condition. Mrs. Zuck also admitted that she had never spent the night at her son’s apartment prior to December 4, 1973. She also admitted co-signing a note on Friday before her son’s trial with Jennifer Worthington so that she could get some cash to have her car repaired, but she denied authorizing these repairs to be done personally. On cross-examination, Mrs. Zuck contended that the several $275 to $400 checks made payable to cash, which were cashed for her by Susan Jennifer Worthington, were for business expenses and not for the purpose of having Jennifer’s car repaired. She also admitted that Jackie Farris had dated her daughter, Susan Morton, and that he had worked for them, and also had helped them at the stables.
Mrs. Zuck also denied calling Mrs. Am-mons in Selma in January of 1974, and asking her to get a motel room in order to keep Lou Zuck away from the police.
Captain A. C. Jarred testified he was a captain in the Sheriff’s Department in Dallas County. He testified that he knew *793 Mrs. Zuck and had worked as a security guard in the evenings at the Selma theatre. He testified that on one occasion she told him she was going to California, that he told her he had a daughter there, and that he would give her the address and phone number. He testified that on the night of December, 4, 1973, he did receive a phone call shortly after midnight, and that he talked with Richard, Linda, and Mrs. Zuck from Birmingham. He said she asked him how the business had been that evening, and asked him to be on the lookout for some 30 to 40 acres of land near town. She also told him that she was not going to California and asked him to be on the lookout for two good walking horses. He denied that Mrs. Zuck had ever given him a boat, but stated that on one occasion she had allowed his son to keep a boat for about two months.
On cross-examination, Deputy Sheriff Jarred admitted that Mrs. Zuck had given him a suitcase and several guns. He testified that he thought their conversation of December 4, 1973, and on the early morning of December 5, lasted for about forty-five minutes.
Lieutenant Joe Stewart was then recalled as a rebuttal witness and testified that on the morning of December S, 1973, he had talked with Mrs. Zuck about 10:30 in the morning. He stated that she told him Rick had come to his apartment about 2:15 that morning, and that his girl friend, Alice Salter,, was also there and could verify this.
Mrs. Betty Sanders, a neighbor on Beaumont Drive testified that she had known Mrs. Zuck for about three years prior to December, 1973, and that on one occasion Jennifer Worthington had come by her home and was introduced as Mr. Zuck’s secretary. She said that this was during the week of December 10, 1973, and that Mrs. Zuck had given her some money in her presence. Mrs. Sanders stated that Mrs. Zuck’s reputation for truth and veracity was bad.
Alice Salter was recalled and testified that when she left Richard Zuck’s apartment to go to her apartment, it was around, 3:00 a. m., and that she did not see him again until about 6:00 the next morning. She also testified that on one occasion, Wednesday, December 12, 1973, after Mr. Zuck’s death, she was at Mrs. Sanders’ home and saw Mrs. Zuck’s Cadillac there. She also testified, on cross-examination, that her apartment was located directly below that of Richard Zuck at the Club Apartments, in December, 1973.
Mr. Cliff Holman was called as a rebuttal witness, and testified that he had been employed at the Jerry Lewis Threatre at Vestavia, and had seen Mr. Zuck on several occasions during the fall of 1973. He said that Mr. Zuck appeared to be very sharp in his conversation with him, and also, he thought, was “a very sharp business man” (R. p. 369).
Mrs. Sid Hall testified that she had known Mr. and Mrs. Zuck, and had been employed by them from August until the middle of November, 1973, that in October, 1973, she was at the theatre office with Susan Zuck Morton and Mrs. Zuck when Susan slammed the telephone down in her mother’s presence and stated after talking to her father, “Somebody ought to kill that man.”
Steve Ammons was called as rebuttal witness and testified that Mrs. Zuck’s reputation for truth in Selma was bad, and that on January 24, 1974, she had telephoned him and asked him to rent a room for Lou Zuck so he would “stay safe because the police were harrassing him” (R. p. 385).
The State also called two or three other persons who had seen Mr. Zuck active in the fall of 1973, at the office, and who testified that Mrs. Zuck’s reputation for truth was bad.
*794 I
Appellant’s able counsel contends that during the voir dire examination of the venire, reversible error occurred with reference to the following (R. pp. 21-22):
“MR. WILKINSON: Before the next juror is brought in Judge, I would like to make the following motion. Two of the prospective jurors so far have indicated knowledge that Mrs. Zuck has a drug case pending in Selma, Alabama, which relates to a very recent arrest on that charge. If the State were to attempt to show some sort of a charge like that in front of a jury, if they were to try to show it, I think it would be error and I think it would be prejudicial to the point of a mistrial, no matter what they did say about it or didn’t say about it, just the attempt to show a charge would be prejudicial enough, in my judgment, to make the Court consider a mistrial. That being what I think is true, I do not believe that it is fair for us to be required to select a jury from a venire comprised of people who have prior knowledge obtained outside this courtroom about a separate independent charge of the type and kind of a drug charge. I think those people should be stricken as a matter of cause.
“THE COURT: Denied.
“MR. WILKINSON: We except.
“THE COURT: Do you want to make that as to anybody who has any knowledge about that ?
“MR. WILKINSON: Anybody who has any knowledge of the drug charge yes sir.
“THE COURT: That is denied..
“MR. WILKINSON: We except.”
Following the denial of the above motion, prospective individual jurors were then brought into chambers, and one at a time were examined by defense counsel (R. pp. 22, 23). After examination of Mrs. Hearst a recess was declared, and after that the examination of prospective veniremen continued. The record then reflects that this continued for over an hour, during which time defense counsel continued to ask questions of prospective members of the venire. The record reflects the following (R. pp. 26-27):
“(THEREUPON, Mr. Wilkinson continued asking questions of the jury venire, during which no objections were made nor exceptions reserved. The following proceedings were then had and done:)
“THE COURT: Ladies and gentlemen we will take about fifteen minutes while the attorneys go over their lists. We’ll select a jury at four-fifteen, so please be back in the courtroom sitting in the seat where you have been sitting all along at that time. There will be fourteen of you who are selected to sit on this jury, so please do not discuss this case with anyone in the hall or permit anyone to discuss it in your presence. Thank you.
“(THEREUPON, Proceedings were in abeyance from 4:02 p. m. until 4:15 p. m., at which time the following proceedings were had and done:)
“THE COURT: Are you gentlemen ready to strike ?
“MR. WILKINSON: Yes sir.
“MR. WAITES: Yes sir.
“THE COURT: You may proceed.
“(THEREUPON, a jury of fourteen was struck between 4:17 p. m. and 4:45 p. m. The following proceedings were then had and done:)
“THE COURT: Is the State satisfied that we have the correct jury in the box?
“MR. GARRETT: The State is satisfied.
“THE COURT: Is the defendant satisfied?
*795 “MR. WILKINSON: Yes sir.”
As may be seen from a careful examination of the above record, the trial court allowed individual questioning of prospective members of the venire.
The record affirmatively reflects the ex-cusal of one member, Mrs. Hearst, because of an opinion formed by her. This was, of course, proper. Title 30, Section 52, Code of Alabama 1940.
Inasmuch as the trial court permitted extensive individual examination, and the record also reflects that no further objections or exceptions are shown, we cannot say that reversible error is here shown. Massey v. State, 49 Ala.App. 345, 272 So.2d 271, cert. denied 289 Ala. 747, 272 So.2d 278, and cases therein cited.
II
We have detailed the evidence in this case, and beyond question the State presented a prima facie case. The trial court therefore properly overruled the appellant’s motion to exclude, and her request for the affirmative charge. Zuck v. State, 1975, 57 Ala.App. 15, 325 So.2d 531, cert. denied 1976, 295 Ala. —, 325 So.2d 539, and authorities therein cited.
III
The appellant asserts as error the admission into evidence of the statement allegedly made by Mrs. Zuck to Frank Meadows in the presence of her daughter Susan Zuck Morton, wherein she purportedly offered Mr. Meadows $500 if he could fine someone to “knock Mr. Zuck off.” The appellant asserts this was evidence of another offense and should not have, therefore, been admitted in evidence in this cause.
We do not agree as the statement in question bears on the feelings or sentiments the accused had on prior occasions expressed toward the victim. Such was therefore material and relevant as tending to show either malice or motive of the accused.
The applicable legal principles governing the admission of such testimony are fully discussed in Padgett v. State, 49 Ala.App. 130, 269 So.2d 147, cert. denied 289 Ala. 749, 269 So.2d 154, and authorities cited therein.
IV
At the conclusion of the trial court’s oral charge, the appellant announced, “We are satisfied.” The trial court then gave eight written requested charges.
As stated by Judge DeCarlo in Zuck v. State, supra:
“We reviewed the refused charges and found they were either covered by the court’s general charge, other given charges, or were abstract, misleading or invasive of the province of the jury. In our judgment, their refusal was proper. T. 7, § 273, Code of Alabama, Recompiled 1958.”
We have carefully examined this record and find no error therein. The judgment is therefore
AFFIRMED.
All the Judges concur.