Appellant was indicted for the murder in the first degree of Albert Spratlin, Jr., by shooting him with a shotgun; she was convicted of manslaughter in the first degree and sentenced, in accordance with the punishment fixed by the jury, to imprisonment for five years.
Uncontroverted evidence established that defendant shot the alleged victim, who died almost instantly as he immediately dropped to the floor from the force of the shot that entered his head and disgorged a large part of his brain. He was twenty-three and she was twenty-nine years of age. The homicide occurred at her home, where she was living with her husband, a few years older than defendant, and their three children. Under her plea of not guilty she claimed she was acting in defense of herself and in defense of her husband and that the *Page 1000 
pulling of the trigger of the shotgun was the result of nervousness rather than an intention to kill Spratlin. She said:
 "I wasn't trying to shoot him. I was just wanting him to stop. . . . I was nervous and scared."
The homicide was the outgrowth of a night of preweekend revelry, in which there was considerable drinking, card playing, music and some dancing at defendant's home, which lasted to or beyond midnight of March 24-25, 1978. Invitees at the party included two brothers of defendant's husband. Also at the party at one time, but not at the time of the homicide, was an uncle of the victim, who danced for a while with defendant. In their testimony, defendant and her husband, Rufus Pope, disclaimed the victim as an invited guest, saying that they had repeatedly tried to get him out of the house by reason of his excessive drinking, his violent and insolent attitude, and an indecent suggestion he made to defendant.
Defendant's husband did not stay at the party all of the time. He and the victim went in the husband's automobile to a night club. Near the night club a fifteen-year-old boy got in the automobile and accompanied them in their return to defendant's house. According to the husband's testimony, but not according to the testimony of the fifteen-year-old boy, defendant's husband and the victim were arguing, and the victim was attempting to get the keys to the automobile from defendant's husband.
The evidence in general was to the effect that after they returned to the home of defendant, the victim and defendant's husband were arguing, that the husband took a .22 caliber rifle and threatened to shoot the victim, that the two wrestled with one another for the rifle.
The testimony of the fifteen-year-old boy tended to show much less provocation and misbehavior, if any, by the victim than did the testimony of defendant and her husband and his brother. There was some evidence to the effect that the victim may have had a knife, but there was strong evidence that he did not display a knife or weapon of any kind.
As we view the record, there was considerable evidence of misconduct and provocation on the part of the victim, and there is some basis for a conclusion that defendant was acting more from fear, nervousness and excitement than from an intention to kill Spratlin, when she fired the shotgun. However, there is substantial evidence to the contrary, and the evidence is strong that not all the material elements of a plea of self-defense or defense of her husband were present. There is no basis for a disturbance of the judgment by reason of any possible claim that the evidence was insufficient to support it.
The homicide occurred in the City of Talladega. The authorities were promptly called at the instance of defendant and her husband. Officer Riggleman was the first to arrive. He testified in part:
 "When I first arrived the door to the house was standing about half way open or a little more than half way. I saw a man laying in the floor. I seen him from his waist down. I approached the house.
"Q You could see that how?
"A From outside the door.
"Q Looking through the open door?
 "A Yes, sir. I approached the house and went up on the porch and I looked around to the living room and didn't see anyone except the man laying on the floor. And then I looked at the man laying on the floor and I could tell by looking at him that he was beyond help, that he was dead. Then I heard a noise in the back of the house and I looked up in the hall and I saw —
 "Q Will you tell us, could you see that through the open door?
 "A Yes, sir, the first I saw was the barrel of a rifle.
"Q Barrel of a rifle?
"A Yes, sir.
"Q Where did you see that?
 "A In the hall way coming out towards the living room.
"Q Alright, sir.
"A Then I saw Rufus Pope with a .22 rifle in his hand *Page 1001 
". . .
"Q What if anything did you say or do then?
 "A I told him to put the rifle down on the floor and he immediately laid the rifle down and then I told him to come out of the house. And at that time his wife stepped out from behind the wall where I could see her. I told her to come out. They came out the front door. I was still standing on the porch. And they came out the front door and Officer Beavers was with me that night and I told him to keep them on the porch out of the house and don't let anyone in and I was going in to see if there was anyone else in the house."
Officer Riggleman's entry into the house under the circumstances, his survey of the house for the purpose of determining who was in the house, his taking possession of the shotgun with which the victim was killed, his awaiting the arrival of an ambulance and the attendants to remove the body, his survey of the body, and his joining other officers to secure the building and taking the defendant and her husband and three children into custody, did not in any way violate any Fourth Amendment rights of anyone. The officer's testimony and the physical evidence, the shotgun, the rifle and other objects in the room pertinent to the issue, and photographs of the premises, did not constitute the fruit of any unreasonable search and seizure. We need only quote what was said by Judge Tyson in Retowsky v. State, Ala.Cr.App., 333 So.2d 193, 199-200
(1976):
 "The several exceptions to the warrant requirements are ably stated in the opinion of Mr. Justice Bloodworth in Daniels v. State, 290 Ala. 316, 276 So.2d 441. It is clear here that the officers knew that a homicide had taken place upon arrival at the scene and seeing the door open and Officer Dawson's daughter sitting in the doorway crying in a very upset condition clearly gave rise to the necessary probable cause to enter the premises and determine what had occurred.
 "Clearly the authorities which are construed under the provisions of Title 15, 154, Code of Alabama 1940, permit an officer to make an investigation where, as here, he has been notified of the commission of a felony and enters the scene unaccompanied by a warrant. Many of these were reviewed by Mr. Justice Lawson in Duncan v. State, 278 Ala. 145, 176 So.2d 840. Recently, this Court has also determined, as here, that probable cause existed and we do so determine now. Bridges (and Rogers) v. State, 52 Ala. App. 546, 295 So.2d 266; Burrow v. State, 55 Ala. App. 24, 312 So.2d 596. The search of the apartment where the homicide took place was in all respects proper."
If officers of the law cannot act with the dispatch that Officer Riggleman did after coming to the scene of a homicide in a private home, and with the efficiency that all of the officers did, there would be little left to the "right of the people to be secure in their persons, houses, papers, and effects." Instead of condemning Officer Riggleman and the other officers, we commend him and them.
Appellant can take nothing from the admission in evidence of a drawing of the scene of the homicide merely because there were items at the scene which were not shown in the drawing.Cauley v. State, 33 Ala. App. 557, 36 So.2d 347, cert. denied251 Ala. 163, 36 So.2d 354 (1948); Gamble, McElroy's AlabamaEvidence (1977), § 123.01 (4).
During a part of the testimony of Chief of Police Sparks, as a witness for the State, Officer Riggleman, who had preceded him as a witness, sat in the courtroom. Defendant objected to Officer Riggleman's resumption of his testimony as a witness for the State, on the ground that he had been placed under the rule and had violated it by remaining in the courtroom. The objection was overruled. Whether a particular witness can be excused from the rule is within the sound discretion of the trial court. Patterson v. State, 53 Ala. App. 567,302 So.2d 540, cert. denied 293 Ala. 770, 302 So.2d 545 *Page 1002 
(1974); Stallworth v. State, 52 Ala. App. 619, 296 So.2d 243
(1974). No abuse of discretion in this respect can be charged to the trial court in the absence of a showing of any injury to defendant by reason of any infraction of the rule. State v.Brookshire, 2 Ala. 303 (1841); Beaird v. State, 219 Ala. 46,121 So. 38 (1929); Stinson v. State, Ala.Cr.App., 341 So.2d 185
(1977); Goldsmith v. State, Ala.Cr.App., 344 So.2d 793, cert. denied, Ala., 344 So.2d 799 (1977).
There is nothing to show that there was any intentional violation of the rule by the witness or that there was any injury to defendant resulting from the violation. There was no error in overruling defendant's objection and allowing the witness to testify. Chancellor v. State, 291 Ala. 413,282 So.2d 242 (1973), relied upon by appellant, is inapposite. The error in Chancellor was as to the right of defendant to have the jury so kept together as to prevent conversation and contact between the jurors and others, including particularly a witness; not involved therein was the right, subject to the discretion of the court, of a party to have the witnesses excluded from the courtroom and required not to engage in conversation about the case among themselves or with anyone else other than the parties or their attorneys.
Defendant gave a written statement as to the circumstances of the homicide at about 4:25 on the morning of March 25. There is no contention that it was not voluntary or that she was not advised of all her rights against self-incrimination and to counsel without expense to her. About the time she signed the statement, Chief Sparks came into the room where the statement was made and while in the process of reading it, he commented:
"We didn't find the empty shell out there." The defendant promptly responded by saying that the shell was in the front bedroom. Promptly thereafter she and Chief Sparks went to her house and found the shell in the bedroom. The circumstances did not require a second reading to defendant of her Miranda rights "prior to her subsequent statement revealing the location of the empty shell," as urged by appellant. Jones v. State,47 Ala. App. 568, 258 So.2d 910 (1972).
We have searched the record for any error prejudicial to defendant and have found none. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article (Constitutional Amendment No. 328). His opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
All the Judges concur. *Page 1369