Mary Jewel Wicker was indicted for the murder of her husband, Troy Wicker, Jr., in violation of § 13A-6-2 (a)(1), Code of Alabama 1975. The jury found the appellant "guilty as charged" in the indictment and the trial judge set sentence at life imprisonment in the penitentiary.
A hearing on the State's motion for continuance was held and Danny Kimbrough, an employee of the District Attorney's office, testified.
He stated that one of the State's witnesses, Patricia Yarbrough, testified at the Grand Jury proceedings and had appeared at all other court proceedings until the case was set for trial. The case was scheduled *Page 1192 
to begin on September 28, 1982, and Yarbrough was served with a subpoena. She never gave any indication that she would not be at the trial. Kimbrough talked to her on Monday, the first day of the trial and told her she would not be needed that day, and he would get back to her on Tuesday.
Later that day, Kimbrough received information that Yarbrough did not intend to appear at trial. He attempted to locate her but had been unsuccessful.
Kimbrough then told the court what the State expected her testimony to be. Yarbrough became friends with one Tommy Arthur while she was working at Sherr's Lounge in Huntsville, Alabama. On January 31, 1982, the day before the victim was murdered, Arthur asked her to buy a particular brand type of .22 rifle cartridges and gave her a $10 bill. Yarbrough secured another party to purchase the cartridges which she then gave to Arthur. At this time, Arthur told her he needed them for a killing.
Kimbrough then stated that the bullets Arthur received were the same kind as those found in the victim's body. He stated Yarbrough was an essential witness for the State. Every effort had been made to locate this witness including the issuance of an attachment for her.
Defense counsel agreed to a short continuance which the trial court granted and the trial began the following Monday, October 4, 1982.
The first witness for the State was Eddie Lang of the Muscle Shoals Police Department. On Monday, February 1, 1982, at 7:45 a.m., Lang was directing traffic at the school crossing in front of the Avalon Middle School, when he noticed the appellant come through the crossing in a red Buick Riviera and wearing a blue housecoat. She then came back through the crossing ten minutes later. Both times she was by herself. He also noticed that Malon Boatright and Captain Robert Hall were behind the appellant the second time she went through the crossing.
At 8:00 a.m., he went on routine patrol and was called to 301 Highland Avenue at 9:12 a.m. He, Officer Lanny Coan and State Trooper Charlie Owens arrived at the house at the same time. When Lang entered the house, he saw the appellant lying on the floor and her sister, Theresa Rowland, was kneeling beside her. The appellant was crying and bleeding from her face. She had on the same blue housecoat she had worn earlier that morning. Lang stated he noticed a vase was broken and the house was somewhat messed up.
In one of the bedrooms, Lang found the deceased lying on the bed. He had been shot in the right eye. Beside the deceased, Lang found four small caliber pistol shells.
The scene was secured, the detectives were called and the officers checked but found no sign of forced entry. The appellant was then transported to the hospital.
Lanny Coan of the Muscle Shoals Police Department testified to basically the same facts as Lang. He asked the appellant if she knew who did it and she stated she did. She then asked where her husband was. Coan asked if he did this and she said no. She then said she had been raped and "a big black nigger did it." (R. 112).
Joseph Wallace, an employee of the Department of Forensic Sciences, stated he went to the Northwest Alabama State Junior College in Tuscumbia on February 1, 1982, around 12:15 p.m. In the parking lot, he saw a maroon Buick Riviera. Inside the automobile, he found a black wig, three wads of hair, a purse and a billfold.
Wallace also went to the appellant's house on that day. He stated the house was messy and everything was in general disorder. He processed the house for fingerprints and gathered certain items for evidence, including the broken vase, the four .22 caliber spent hulls and the bloodstained pillowcase.
Dr. Daniel Parks McKinley testified he treated the appellant at the emergency room of Helen Keller Memorial Hospital on February 1, 1982. The appellant had a bruise around her left eye, a laceration of *Page 1193 
her left upper lip, two chipped teeth and an abrasion on her left hip. She was hospitalized for a week but was given a pass to attend her husband's funeral. McKinley stated there was no physical necessity to keep the appellant in the hospital but she felt she needed to stay.
Brent Wheeler of the Department of Forensic Sciences testified he received four CCI .22 caliber cartridge cases, a .22 bullet removed from the body of the victim and a bloody pillowcase. From the presence of powder flakes on the pillowcase, Wheeler concluded the victim had been shot at close range. Wheeler examined the bullet and determined it was consistent with a .22 caliber CCI mini-mag, the same type as the four spent hulls.
Josephino Aguilar, a forensic pathologist with the Department of Forensic Sciences performed the autopsy on the deceased. He concluded the cause of death was a solitary gunshot wound to the right eye fired 16" to 24" directly above the deceased. Dr. Aguilar also observed gunpowder tatooing around the eye area and unburnt gunpowder on the neck and chest. The unburnt powder on the neck and chest area was not caused by the same shot which hit the deceased in the eye.
John Kilburn of the Department of Forensic Sciences examined the three hair samples and the wig found inside the appellant's car. He testified the hair samples were Negroid and had been forcibly removed. He did not find any Negroid hair in the wig.
Joel Reagan testified that he owns Joel Reagan Homes in Decatur. He met Tommy Arthur in the mobile home business and had known him eleven or twelve years. Reagan stated Arthur had pled guilty to the murder of his sister-in-law in Marion and went to prison. Arthur came to work at his business on the work release program in November, 1981. Sometimes Arthur would come to work after he had been drinking and did not work every day eight hours a day.
In February, 1982, Reagan received an outrageous phone bill. Arthur admitted making over fifty long distance calls in January to the appellant's house and the last call was made on January 30, 1982. Reagan also said he had seen the appellant with Arthur several times at his place of business.
Deborah Tines testified she is the manager of Sherr's Lounge in Huntsville. She met Arthur in December, 1981. Arthur came to the lounge once or twice a week and they became friends.
One day Arthur asked her what she did for protection, and she said she carried two guns. Then Arthur asked if she ever heard of any guns for sale.
On February 1, 1982, Deborah Tines had a luncheon date with Arthur and he arrived at 11:30 a.m. They drove on I-65 to the river bridge. Arthur stopped on the bridge, got out and threw a package over the bridge and they returned to Huntsville and had lunch. Tines said Patricia Yarbrough had worked at the lounge as a waitress.
Terry Lewis stated Patricia Yarbrough asked him to purchase some ammunition for her. She gave him $10 and he went to Woolco and purchased some CCI .22 long mini-magnum bullets. The date on the receipt was January 31, 1982.
Both parties stipulated to the following statement as the testimony of Patricia Yarbrough: (R. 265-266).
 "I met Tommy Arthur in November of 1982 (sic) at Cher's (sic) Lounge in Huntsville. Tommy was in and out of the lounge all the time. Tommy told me that he was a friend of Gene Moon's. I used to date Gene a while back. Tommy and I became friends. On Sunday, January 31 Tommy came in the lounge about 2:00 p.m. Tommy was in a hurry and told me that he needed some bullets and they had to come from Woolco. He wrote down the kind that he wanted, .22 cal. long mini-mags. I got Terry Lewis to go to Woolco to get the bullets because I didn't want to sign for them. After I gave him the bullets which he paid for he left."
Patrick Halliday testified he is the assistant director of the work release center in *Page 1194 
Decatur. The daily log book shows that Arthur claimed he worked almost every day of the month for eight hours a day. An investigation of Arthur ensued because the hours reflected in his paycheck were not consistent with the hours Arthur was giving in the log book. On March 17, 1982, officials made a search of Arthur's personal items and discovered twenty-one $100 bills inside an envelope contained in Arthur's coat pocket.
The daily sign-in book showed that Arthur left the work release center at 6:00 a.m. on February 1, 1982, and returned at 7:50 p.m. On January 31, 1982, Arthur was away from the center from 9:30 a.m. until 6:55 p.m.
Captain Robert Hall testified he is chief of detectives of the Muscle Shoals Police Department. He talked to the appellant on Friday, after Troy Wicker was killed and she was not a suspect at this time.
The appellant stated that on February 1, 1982, she left her house to take her children to school. On the way, she bought gas and then dropped the children at school. She decided to go see her sister but changed her mind and went home. She said she was driving a maroon Buick Riviera and had on slacks, blouse and a short tan jacket.
When she walked into her house, it was a mess. The appellant claimed she saw a black male who hit her and after that she could not remember anything else. She also related that she had noticed a black male driving a gray Cougar following her. The appellant also claimed some jewelry was missing from her home but it was not recovered.
Hall stated that the appellant's neighbors were questioned but the police did not gain any useful information and they could not develop any leads on the black male. The police also pursued a tip they received from Alcorn, Mississippi, but it was fruitless.
Hall spoke with the appellant several more times until she got an attorney who instructed her not to talk to them anymore. On one of the occasions the police talked to the appellant, she denied knowing Arthur.
In April, the appellant was advised she was a suspect and was asked about Arthur again. At first she denied knowing him but later she admitted having known him for twelve or thirteen years, and that she had talked to him on several occasions recently.
Hall stated Arthur became a suspect when the police learned that he had a large amount of cash on him when he was on work release. The police learned of Arthur's identity and talked with Reagan who showed them his telephone bills. Fifty-one calls were made to the appellant's telephone number and other calls were traced to her sister, Theresa Rowland's number.
Malon Boatright testified he saw the appellant on the morning of February 1, 1982, and saw her sister with a man in her car on the same morning.
Doug Aycock, the captain of detectives for the Sheffield Police Department stated he was present when the appellant first denied knowledge of Arthur and was also present when she admitted she knew him. Aycock admitted he had talked to Captain Hall during the trial.
Dot Richter, the switchboard operator at the Helen Keller Memorial Hospital testified concerning three certain telephone numbers at the hospital. These numbers were called from Reagan Mobile Homes during the week the appellant was in the hospital.
Wanda Luther testified she saw the appellant and Arthur at Lloyd's Lounge in Corinth, Mississippi, on New Year's Eve. She said Arthur had called her several times and her number was one of those listed on Reagan's telephone bill.
C.J. Cox, a Marion County district attorney, testified he investigated a murder which occurred in March, 1977. The deceased was Arthur's sister-in-law. She had been shot with a large caliber handgun in the right eye, but the weapon was never found. Arthur pled guilty to second degree murder and was sentenced to life imprisonment.
Theresa Rowland, the appellant's sister, stated she worked with Arthur in Blue *Page 1195 
Mountain, Mississippi. She didn't see him after that until February, but she had talked to him on the phone.
Arthur called her at work and at home frequently to give the appellant messages. She did not know it was him until January because he identified himself as "Billy".
On the morning of February 1, Arthur called Rowland and asked her to pick him up at the water tower in Tuscumbia. He said he needed to go to the airport to meet the appellant.
When she picked him up, he was wearing a plaid shirt, a sweat shirt and jeans. He had a bottle of whiskey in a paper bag and was drinking it. As they were driving down Avalon, they met the appellant coming from the opposite direction. Both cars turned around and they met and stopped. Arthur opened the door and said, "if you ever tell anybody this, if I don't get you my friends will." (R. 402). Arthur got into the appellant's automobile and Rowland went to work.
A little while later, the appellant called her sister at work and told her to come to her house because she needed help. When she got there, she saw the appellant on the floor with blood on her mouth and crying. Rowland stayed with her sister until the police came and then went with her to the hospital.
On the Saturday before the deceased was murdered, Rowland talked to him twice from the Memphis airport. He was upset because he could not get in touch with his wife.
Rowland testified there were several calls to Decatur on her telephone bill but she did not make them. She said the appellant used her telephone frequently. On Sunday night, the appellant, the deceased and their two children ate dinner at her house and the appellant used the phone that night.
Mary Smith, the appellant's mother, said the deceased, the appellant and their two children came to her house on the Sunday before the murder. The deceased told her he did not go back to work on Saturday but planned to on Monday. He also told her about a black man who had been following him but he said he would take care of it. They did not stay long and the deceased begged his mother-in-law to come home with them, but she did not.
At the time of the murder, Smith did not know Arthur but had heard about him in connection with the death of his sister-in-law. She met Arthur on two occasions, once when she dropped the appellant off at Arthur's father's house and once when they all went to Huntsville together. On one of those meetings, the appellant told her daddy that she had known Arthur for a long time and they planned to get married.
After the murder, Smith moved in with the appellant until the appellant moved to Tennessee with her. About a week after the deceased was killed, the appellant told her mother that she and Arthur had been planning to kill the deceased for about two months. She said Arthur drove the car from her house to the place where it was found and she took the jewelry that was supposedly missing to a man named Theron at the direction of Arthur. The appellant gave Arthur $20,000 of the insurance money and told her mother not to tell anybody or else she would get what the deceased did. Smith said she was aware of the reward offered in this case but was not interested in it.
The first defense witness was Arley Wicker, the deceased's brother. He lives in West Memphis, Arkansas, and received a call from the deceased on the Saturday before he died. Wicker went to Memphis airport expecting to find his brother, but he was not there.
Diane Smith is Mary Smith's daughter-in-law. She testified that her mother-in-law told her on several occasions that she would give each of her children $1,000 if she got the reward.
She said she saw the deceased on the day before he died and he was acting different than usual.
The appellant testified she took the deceased to the airport on Saturday morning. Later that afternoon, her husband called *Page 1196 
and she picked him up at the airport and he was scared. On Sunday, they all went to Tennessee to her mother's. They returned that afternoon and stayed at home the rest of the day.
On Monday morning, her sister called and said Arthur wanted to meet her at the airport. After she dropped the boys at school, she went to the airport. When Arthur and her sister arrived, Arthur got out of the car and talked to the appellant. He wanted to borrow some money. She gave him $40 and she went back home and he walked away.
When she got home, her house was a mess and a black male hit her with something and she didn't remember anything else.
The appellant admitted that she talked to Arthur on the phone all the time and that she had seen him on several occasions at Reagan Mobile Homes. She said the deceased knew Arthur and did not know why Arthur did not call her house when the deceased was away. She stated she knew Arthur's family and checked on them while he was in prison. The appellant saw Arthur and his family after the murder when her mother had dropped her off at his family's home.
She said she denied any knowledge of Arthur to the police because he was in prison and she knew they would go after him. She denied that she participated in her husband's death in any way and stated her mother and her sister were trying to frame her.
The appellant also stated the deceased had a large amount of insurance on his life.
 I
The appellant's first contention is that the trial judge erred when he denied the defense's Motion to Require the State to Disclose the name of a certain witness. The witness was Mary Smith, the appellant's mother, and the appellant claims she was prejudiced because she was unable to question the jury on voir dire as to their feelings about a mother testifying against her own daughter.
First of all, there is no requirement that compels pre-trial discovery of the identity of a State's witness. Evans v. State,338 So.2d 1033 (Ala.Cr.App. 1976), Thigpen v. State,49 Ala. App. 233, 270 So.2d 666 (1972).
Secondly, the fact that defense counsel was unable to question the prospective jurors concerning their feelings about the appellant's mother testifying against her is not material. The appellant knew that her sister was going to testify and defense counsel could have asked the jurors about that relationship. The appellant most probably knew her mother was going to testify against her because she stated on the witness stand that she knew her mother and her sister were trying to frame her.
Lastly, the trial judge has broad discretion to control discovery. The reasons for the trial judge's refusal to grant the motion cannot be ascertained from the record. However, we can surmise it was for the safety of this witness because of the threat made to her by the appellant and the disappearance of one of the State's witnesses.
This court will not disturb a decision of a trial judge unless there was a clear abuse of discretion. We can find none here.
 II
The appellant claims the trial judge erred when she granted the State's motion for continuance. The purpose of the continuance was to give the State time to locate one of their essential witnesses who disappeared the day the jury was empaneled.
The law in this jurisdiction is well settled that the grant or denial of a continuance is within the sound discretion of the trial judge. Sparks v. State, 46 Ala. App. 357,242 So.2d 403, cert. denied, 236 Ala. 738, 242 So.2d 408 (1970), cert. denied, 402 U.S. 909, 91 S.Ct. 1382, 28 L.Ed.2d 650 (1970). However, there are limitations on the trial court's discretion. This court stated *Page 1197 
in Smith v. State, 368 So.2d 298 (Ala.Cr.App. 1978), some of those limitations as guidelines for determining whether the absence of a witness necessitates a continuance. These guidelines are as follows: (1) there must be a showing as to what the witness would tetify; (2) there must be a showing that the moving party could probably locate the witness and have the witness served within a reasonable time; (3) that there had been an effort to secure the presence of the witness until the day of the trial.
In the present case, we believe the State showed the materiality of the witness' expected testimony and that the State had been diligent in their efforts to procure the witness' presence at the trial by the use of compulsory process.
Furthermore, there is some evidence that defense counsel agreed to the continuance of one week. Therefore, for the reasons stated above, we conclude the trial judge did not abuse her discretion by granting the continuance.
 III
The appellant asserts that the admission of two photographs which portrayed the deceased's wounds was error because the photographs were cumulative and inflammatory and therefore, not probative. This assertion is without merit.
 ". . . [P]hotographs which depict the character and location of external wounds on the body of a deceased victim are admissible even though they are cumulative evidence based upon an undisputed matter. Hines v. State, Ala.Cr. App., 365 So.2d 320, cert. denied, Ala., 365 So.2d 322 (1978); Ellenburg v. State, Ala. Cr.App. 353 So.2d 810 (1977). The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Richards v. State, Ala. Cr.App., 337 So.2d 171, cert. denied, Ala., 337 So.2d 173 (1976)."
Carpenter v. State, 400 So.2d 417, 422 (Ala.Cr.App. 1981).
Therefore, we conclude the trial court properly exercised its discretion in admitting these photographs.
 IV
The appellant argues reversible error was committed because the trial judge permitted testimony concerning the ultimate fact in issue when she allowed Dr. McKinley to characterize the appellant's injuries as slight.
We agree with the appellant that a witness may not give his opinion on the ultimate fact in issue. However, the ultimate issue in this case was whether the appellant killed her husband not the extent of her injuries. The fact that Dr. McKinley described the appellant's injuries as slight does not suggest that the appellant killed her husband. Therefore, there was nothing improper about Dr. McKinley's testimony.
 V
The appellant contends the rule was violated when two of the State's witnesses, Captain Hall and Captain Aycock, discussed the case and their testimony during the course of the trial.
First of all, when the rule was invoked, there was no instruction given to the witnesses that they were not to talk to each other during the trial.
Secondly, the jury was aware that the two witnesses discussed this case together because defense counsel questioned Aycock about this matter while he was on the witness stand. It was obvious from both of these witnesses' testimony that they had worked together on this case and were extremely interested in the prosecution of this case.
Lastly, there is nothing contained in the record which indicates that the witnesses intentionally violated the rule or that the appellant was injured by the "suggested" violation of the rule.
Considering the above facts, we do not believe the trial judge abused her discretion in denying the motion to instruct on *Page 1198 
the alleged violation of the rule. See Pope v. State,367 So.2d 998 (Ala.Cr.App. 1979).
 VI
The trial judge refused to admit into evidence copies of two letters and the appellant contends this was reversible error.
The trial judge was in the best position to determine the relevancy of these two letters in relation to the case during the trial. The determination of the relevancy of a particular item of evidence is left to the sound discretion of the trial judge and this court will not reverse unless that discretion has been grossly abused.
Since the contents of the letters in question are not contained in the record, we must conclude the trial judge properly exercised her discretion in excluding these letters from evidence.
 VII
The appellant contends the State failed to prove a prima facie case and therefore, the verdict was contrary to the evidence. We must agree with the appellant that her conviction was based entirely on circumstantial evidence. However, we do not conclude the evidence was insufficient to support that conviction.
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." (Citations omitted).
Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1979).
Whether there was sufficient circumstantial evidence to exclude every other reasonable hypothesis but that of guilt is a question for the jury and this court will not substitute its judgment for that of the jury. Thomas v. State, 363 So.2d 1020
(Ala.Cr.App. 1978).
 "This court will not disturb a verdict of conviction on the grounds of insufficiency of the evidence, `unless, allowing all reasonable presumptions for its correctness, the proponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong and unjust.'"
Johnson v. State, 378 So.2d 1164 (Ala.Cr.App. 1979). This court is not so convinced.
From our examination of the record, we find that there was clearly sufficient evidence, presented by the State, so that the jury could conclude, by fair inference, that the appellant was guilty of the crime charged, beyond a reasonable doubt.
We have examined this record and find no error. This case is therefore affirmed.
AFFIRMED.
All the Judges concur.