[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 872 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
The appellant, Thomas E. Bryant, Jr., was convicted of six counts of theft of property in the first degree, a violation of § 13A-8-3, Ala. Code 1975. The trial court sentenced Bryant to consecutive 20-year sentences for each conviction and ordered him to pay restitution.
Bryant was a licensed attorney engaged in the private practice of law in Mobile. In 1973, Bryant was appointed by the Mobile County Probate Court as the general guardian for Mobile County; he continued as general conservator until June 1995. As the general conservator for the county, Bryant received, managed, and disbursed funds belonging to wards of the state — either children or incompetent adults — whose trust accounts were placed under his supervision by the probate court. Bryant also managed the funds of persons referred to him by other attorneys, who had often obtained large sums of money on behalf of their clients through judgments or settlements.
Bryant initially created separate conservatorship or trust accounts for each ward and private client. Often, a separate checking account was opened for each and the necessary expenses were paid from the designated checking account. In other instances, an inhouse ledger was prepared to document deposits and receipts. This procedure established a "paper trail" of deposits to and withdrawals from each account and it ensured that the accounts were not commingled with other funds maintained in Bryant's firm *Page 873 
trust account. The conservatorship and private-client accounts and the firm trust account were maintained separately from the firm fee account. Fees were deposited to and then disbursed from the firm fee account, and firm expenses were paid out of this account.
In an interview with law enforcement officials, the appellant admitted that he began withdrawing money from clients' accounts to cover his office overhead and expenses. He estimated that he had stolen several million dollars over a period of approximately five years. The appellant further admitted that in instances where an accounting to the probate court would have revealed missing funds, he requested and obtained continuances. When an accounting to the probate court could not be postponed, the appellant would transfer money into the account to make it appear as if everything was in order; then once he had bank verification of the proper amount, he would again withdraw the money.
Bryant's illicit activities remained undetected until October 1994. At that time an attorney who had been appointed guardian ad litem for the estate of Robert Ward noticed discrepancies in the accounting of the estate funds provided to him by Bryant's firm. In addition, in June 1995, one of Bryant's clients, Ms. Elois Gillam, became upset with Bryant's management of a $3.6 million settlement that had been obtained for her husband's estate by the law firm of Cunningham, Bounds, Yance, Crowder Brown ("Cunningham, Bounds"). Ms. Gillam's account had been referred to Bryant for disbursement of the settlement funds to the heirs of her husband's estate. Lawyers from Cunningham, Bounds telephoned Bryant's law firm on June 6, to inquire about the Gillam estate on that same day, Bryant entered a hospital for treatment for an addiction to Lortab, a narcotic. Attorneys from Cunningham, Bounds went to see Bryant in the hospital to discuss the Gillam estate with him. Bryant told the attorneys that he had taken money from the Gillam estate "to keep the office going."
Bryant's mishandling of the Gillam estate and the Robert Ward account triggered an investigation by the Mobile County district attorney's office into his law practice. This investigation revealed that the appellant had taken in excess of $1,000,000 from at least five conservatorship accounts, and that he had improperly removed over $1,000,000 from the funds belonging to the Gillam estate. The money removed from these accounts was deposited in either the firm trust account or the firm fee account. Some of these funds were subsequently deposited into the appellant's personal bank accounts. The appellant was charged with the theft of the funds missing from the six accounts.
 I.
The appellant contends that the trial court erred in denying his motion for a mistrial, which was based on the trial court's allegedly improper comment on the evidence. We disagree.
The that court's remark occurred during a witness's testimony concerning audits that he had conducted of the various conservatorship accounts and of the Gillam estate. The witness, James Kenny Crow, Jr., explained the disbursement of checks from one of the conservatorship accounts, in part, as follows:
 [Crow]: There were viable distributed funds on behalf of Miss Chestnut [the ward] out of this account of $38,914.80 that were for the benefit of the ward. There were two checks that were written out of this account to Mr. Bryant and deposited into his trust account, one for $7,000 and one for $3,000. There was a third check for $750 that was written to Mr. Bryant that was deposited into his operating account, or as they called it, his fee account for his law firm where he operated his firm's checkbook from. So the total amount that went out of this account to Mr. Bryant was $10,750.
 "[Defense attorney]: Judge, I object as to the characteristic as it was going to Mr. Bryant, that they went into an account. I object to the characterization that they went to Mr. Bryant and into his account. It may have been in his name, but —
 "THE COURT: If it was in his name, then it to him. Overruled. *Page 874 
"[Defense attorney]: We respectfully except.
 "THE COURT: Your objection is noted for the record. Go ahead."
(R. 369-70.) (Emphasis added.)
Crow concluded his testimony, and the trial court recessed. At the recess, the following discussion ensued:
"THE COURT: Let's take up what you wanted to take up.
 "[Defense counsel]: Yes Sir, Judge. The defendant would move for a mistrial at this time based on what we contend to be the court's commenting on the evidence. . . . [T]he court made the comment well, if it went into an account, it went to him.
". . . .
 "THE COURT: . . . . Your motion for mistrial is denied. . . What your objection was was that you objected to [Crow's] testimony that it was said to Mr. Bryant, and I stated that you said it; was paid into his account. Well, they are both the same. Mr. Bryant's account. That happened after it got into the account is for a jury to decide. The court made the comment in response to your objection or to clarify your objection, but the court absolutely has refrained from and does not comment on any evidence. . . ."
(R. 373-75.)
As the excerpt from the record evidences, Bryant did not move for a mistrial when the trial court made the allegedly improper comment in overruling his objection. Rather, the mistrial motion was not made until the court recessed at the conclusion of the witness's testimony. The state contends that Bryant's motion for a mistrial was untimely because it was made well after the trial court's allegedly objectionable comment occurred. There is support for the state's position. Robinson v. State,584 So.2d 533, 538-39 (Ala.Cr.App.), cert. quashed, 584 So.2d 542 (Ala. 1991). While the trial court did indicate at the recess that it would allow Bryant to address a matter that he wanted to "take up," what the trial court Was referring to is not abundantly clear from the record. The logical inference from the record is that the trial court was referring to the witness's answer and the trial court's ruling on Bryant's objection to that answer — as opposed to any comment by the trial court-because no motion for a mistrial had yet been made. There is certainly no indication from the record that the trial court was aware that Bryant planned to move for a mistrial based on a comment the court made while overruling an objection.[1] Thus, it would appear, absent any clear indication to the contrary in the record, that this issue was not preserved for our review.
Even so, Bryant is due no relief on his assertion that the trial court's comment warranted a mistrial.
"The law does not prohibit the trial judge from giving trial counsel his reasons in making certain rulings as to the law applicable to the case. . . . Bedingfield v. State, [47 Ala. App. 677, 681, 260 So.2d 408, 412 (1972)].
 "`In 23 C.J.S., Criminal Law § 993, p. 1024, it is said, "Generally, it is not improper comment on the evidence for the judge to explain his ruling on a matter of law, and he may refer to testimony and state its legal effect, in deciding a point raised during trial."'"
Hampton v. State, 620 So.2d 99, 103 (Ala.Cr.App. 1992), quoting McDonald v. State, 340 So.2d 80, 83
(Ala.Cr.App.), cert. denied, 340 So.2d 84 (Ala. 1976). Here, the trial court's comment was made when overruling Bryant's objection to a portion of Crow's testimony, and was offered merely as an explanation of the court's ruling on the objection. Thus, the trial court's remark did not constitute an improper comment on the evidence.
Furthermore, we note that the trial court instructed the jury that it was the trier of fact and that any ruling that the trial court made was not to be considered evidence. Jurors are presumed to follow the trial court's instructions. Holland v. State, *Page 875 588 So.2d 543, 549 (Ala.Cr.App. 1991). Thus, the judge's instruction to the jury prevented any possible prejudice. Rule 45, Ala.R.App.P.
 II.
Bryant contends that the trial court erred in sustaining the state's objection to questions posed during Bryant's cross-examination of a witness, Martin Lester, concerning his opinion of Bryant's mental state.
Lester, an attorney formerly employed in Bryant's law firm, testified that new attorneys in the firm were paid large salaries for little work, and that Bryant's secretary, Brenda Loftin. used the firm's credit card for personal purchases. Lester further testified that his salary was paid out of Bryant's personal checking account at a Spanish Fort. bank, rather than out of the firm's checking account. The checks to Lester from Bryant's personal checking account were signed by the "office runner," King Palmer. When defense counsel attempted to ask Lester if he thought that allowing the office runner to sign Bryant's personal checks was "evidence to you that [the appellant] was acting a little weird, . . . and [un]reasonable," (R. 154), the state objected and the trial court sustained the objection. The objection was sustained on the ground that testimony concerning any checks written on the Spanish Fort account was irrelevant because this account was not the subject of any of the criminal charges against Bryant. Bryant subsequently made an offer of proof that this testimony was relevant to show his mental state. Defense counsel further stated that he was attempting to attack Lester's credibility concerning his testimony that, when he was working with Bryant, Bryant's mind appeared to be "intact."
Even if we were to assume that the trial court erred in sustaining the state's objection, any erred would have been harmless. The trial court gave Bryant wide latitude in presenting numerous instances of Bryant's unusual behavior and office practices. Seven of Bryant's former employees testified at the trial. Some of those employees testified that Bryant's physical condition had waned in recent years and that his ability to function in the office had deteriorated. Two former employees, an attorney and a clerical assistant, testified that in their opinion Bryant was not capable of managing his office from 1993 to 1995. Other employees testified about Bryant's drug abuse and its effect on his behavior and work habits. Over the course of the six-day trial, the trial court allowed the defense to present testimony concerning Bryant's unusual, and in some cases, inexplicable, accounting practices and spending habits. For example, several witnesses testified that Bryant paid large salaries to employees who worked only a few days out of each month. Bryant often paid these salaries out of his Spanish Fort personal checking account and he failed to withhold taxes from the checks. Bryant gave employees large sums of money as wedding presents, and he provided "loans" to employees, their families, and their friends, Dr. Daniel Koch and Dr. Joseph Dolce, clinical psychologists who treated Bryant, testified that his long-term drug abuse had caused permanent brain damage and had impaired his memory and his ability to concentrate.
Given all of this testimony, we conclude that Bryant was not prejudiced in his ability to present evidence concerning his mental state. A wealth of evidence was presented from which the jury could decide whether, in fact, the appellant was mentally impaired at the time that the funds were misappropriated.
 "`[W]here objection is sustained, but the party nevertheless, proceeds to get in the evidence sought, in substance and effect, which is not excluded and remains for the jury's consideration, the initial ruling, if erroneous, is harmless.' Roberson v. Stats, 233 Ala. 442, 444, 172 So. 250, 251 (1937). The exclusion of admissible evidence does not constitute reversible error where the evidence `would have been merely cumulative of other evidence of the same nature, which was admitted.' Ex parte Lawson, 476 So.2d 122, (Ala. 1985)."
Houston v. State, 565 So.2d 277, 281
(Ala.Cr.App. 1990). Because Bryant was permitted to present ample evidence pertaining to his mental state, any error in sustaining the state's objections to defense counsel's cross-examination *Page 876 
of Lester was harmless. Rule 45 Ala.R.App.P.
 III.
Bryant contends that the trial court erred in denying his motion for a mistrial, which, as best we can determine was based on two related matters: (1) prosecutorial misconduct and (2) the unavailability of a material witness.
Initially Bryant argues that his mistrial motion should have been granted because, he claims, the prosecution engaged in misconduct when it informed one of Bryant's witnesses, Dorothy Wilson at she was under investigation by law enforcement officials based on her involvement in furnishing drugs to Bryant. The record reflects that Bryant attempted to call Ms. Wilson as a witness late on a Friday afternoon. Before she took the stand, the prosecution requested, outside the presence of the jury the trial court advise Ms. Wilson of her constitutional right against self-incrimination because, it said, she was under criminal investigation for the unlawful distribution of, controlled substances; the charge related to her furnishing drugs to Bryant. The court allowed the prosecution to tell Ms. Wilson that she was under investigation. The prosecution further informed Ms. Wilson that She possibly faced 20 charges of unlawful distribution of a controlled substance and that the minimum sentence, if she was convicted, would be in excess of 100 years' imprisonment, without the possibility of probation or parole. Upon hearing this, Ms. Wilson fainted. After she was revived, the trial Court advised her that she might want to retain a lawyer. Ms. Wilson agreed that she should speak with a lawyer before deciding whether to testify. The trial court instructed her to return to court with her decision at 9:00 a.m. on Monday morning, and the recessed the trial.
On Monday morning, an attorney appeared on Ms. Wilson's behalf and informed the trial court that Ms. Wilson had been hospitalized for a cardiac conditions and thus, that she would not be available for trial. Bryant then moved for a mistrial, claiming that the prosecutor had intimidated Ms. Wilson with his comments on the previous Friday afternoon and that he had thereby prevented Bryant from calling her as a witness. The trial court denied the motion.
Bryant did not object to the prosecutor's comments to Ms. Wilson when the comments were made. Although defense counsel did move for a mistrial based on these particular comments, he did not do so until long after the comments were made. In fact, Bryant waited until after the court recessed on Friday and reconvened on the following Monday to file his motion. A motion for a mistrial compensates for the lack of an objection "as long as the motion for mistrial follows immediately after the offending question" or comment. Roberson v. State,584 So.2d 533, 538 (Ala.Cr.App.) (emphasis in original), cert. quashed, 584 So.2d 542 (Ala. 1991); see also Ex parte Marek,556 So.2d 375, 379 (Ala. 1989); Allen v. State,659 So.2d 135, 144 (Ala.Cr.App. 1994). Because Bryant failed to move for a mistrial immediately after the alleged prosecutorial misconduct, his motion was untimely, and it preserved nothing for appellate review. Butler v. State, 659 So.2d 1021, 1022
(Ala.Cr.App. 1995).
Furthermore, claims of prosecutorial misconduct are subject to a harmless error analysis. Smith v. State,698 So.2d 189, 203 (Ala.Cr.App. 1996), aff'd, 698 So.2d 219 (Ala. 1997); Bush v. State, 695 So.2d 70, 131 (Ala.Cr.App. 1995), aff'd, 695 So.2d 138 (Ala. 1997). "In order for a constitutional error to be deemed harmless under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824,17 L.Ed.2d 705 (1967)], the state must; prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45 [Ala.R.App.P.] the state must establish that the error did not injuriously affect the appellant's substantial rights." Clora v.State, 628 So.2d 954, 973 (Ala.Cr.App. 1992), aff'd,628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012,114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). We do not believe that Bryant was prejudiced by the unavailability of Ms. Wilson because her testimony was cumulative. Moreover, Ms. Wilson's testimony could just as easily have harmed Bryant's case as it helped it. The jury could have viewed Ms. Wilson's testimony concerning Bryant's *Page 877 
generosity as further evidence of his guilt, rather than evidence of his diminished mental capacity. Bryant has failed to demonstrate that he was prejudiced as a result of the prosecutor's actions or that the prosecutor's actions probably injuriously affected his substantial rights. Rule 45, Ala.R.App.P. Thus, any error that resulted from the prosecutor's conduct was harmless.
Bryant also argues that his motion for a mistrial should have been granted because, he claims, the prosecutor's alleged misconduct resulted in the unavailability of a material witness for the defense — i.e., Ms. Wilson. As previously set out after Ms. Wilson was informed that she was under criminal investigation, she fainted and subsequently entered the hospital. Our review of the record reveal; that this aspect of Bryant's argument was preserved for appellate review, given that defense counsel's motion came just after Ms. Wilson's attorney advised the court that although Ms. Wilson wanted to testify, because of her poor health, she would not be available to testify. In our opinion, this was defense counsel's first possible opportunity to put the trial court on notice of his objection to Ms. Wilson's unavailability.
"A mistrial is a drastic remedy to be used sparingly and only to prevent manifest injustice, and the decision whether to grant it rests within the sound discretion of the trial court."Tally v. State, 687 So.2d 1261, 1275 (Ala.Cr.App. 1996) (citing Inmin v. State, 654 So.2d 86 (Ala.Cr.App. 1994)); see also Grimsley v. State, 678 So.2d 1197, 1206
(Ala.Cr.App. 1996). We find to a mistrial would have been too drastic a remedy, given the fact that the gist of Ms. Wilson's testimony had already been establish through the testimony of other witnesses. Defense counsel proffered that Ms. Wilson would have testified that she was a medical assistant for the doctor Who treated Bryant, and that she often provided Bryant with Lortab. She would also have testified that Bryant permitted her and her adult children to use his law firm credit card and that he gave her substantial sums of money. Bryant contended that this testimony would have been relevant to demonstrate his bizarre behavior, which, he argued, was evidence of his diminished mental capacity.
Evidence concerning Bryant's addiction to Lortab had been previously established by the testimony of numerous witnesses, including Bryant's friends and attorneys and support staff who had worked in Bryant's law firm. As noted above, two clinical psychologists testified extensively about his drug abuse and resulting dementia. Furthermore, as set out in Part II of this opinion, several if Bryant's employees testified about his impaired physical condition, his erratic behavior, and his unusual spending habits. Other witnesses, who were acquaintances of Bryant's, testified concerning large cash gifts that he had given them. In light of all of the testimony about Bryant's drug abuse and his extravagant spending habits. Ms. Wilson's testimony would merely have been cumulative to the evidence already presented and to matters that had already been exhaustively explored.
Accordingly, the trial court did not abuse its discretion in denying Bryant's motion for a mistrial. Hamilton v.State, 680 So.2d 987, 992-93 (Ala.Cr.App. 1996).
 IV.
Bryant suggests in his discussion of Issue I in his brief to this Court that the trial court erred in refusing to allow Bryant's former bookkeeper, Stan Reid, to testify that Bryant's secretary, Brenda Loftin, withdrew money from the firm fee account for her own use. Specifically, Bryant contends that the trial court erred in refusing to allow him to introduce into evidence checks bearing Ms. Loftin's signature that were written on the firm fee account and that were deposited into her personal account.
Reid testified that Ms. Loftin was authorized to write checks on the firm fee and trust accounts, but not on the conservatorship accounts. Reid further testified that the employees were permitted to use the law firm credit card and that Ms. Loftin paid all of the charges on the credit card bill with checks written out of the firm fee account. When Bryant attempted to introduce into evidence checks that Ms. Loftin had written *Page 878 
on the fee account to her personal account, the state objected the trial court sustained the objection. In sustained the objection, the trial court explained:
 "If you can show me where Brenda Loftin wrote checks from the [Wards'] account transferred the money to the fee account, and then wrote the checks out of the fee account, and then show some of the money went to her personal account, I will allow you to do it. The only thing that you are showing is the checks were written on the fee account. I don't know where the money came from. And if Mr. Bryant ordered someone to put it in he trust account, what difference does it make who writes out of the fee account? . . . Just to put checks in to show Brenda Loftin is writing out of the account is not connected with what we are trying. . . . We are trying Mr. Bryant to see if he either took the money himself . . . out of the wards' accounts, and put it in, allegedly to several accounts."
(R. 936.)
"The determination of the relevancy of a particular item of evidence is left to the sound discretion of the to trial judge and this court will not reverse unless that discretion has been . . . abuse." Wicker v. State, 433 So.2d 1190, 1198
(Ala.Cr.App. 1983). Given the large number of check written out of the various accounts maintained by Bryant's law firm, the trial court was justified in requiring that Bryant connect Ms. Lofitn's check writing from the firm fee account with the conservatorship accounts from which funds were misappropriated. The state traced, in detail, the funds coming directly out of the conservatorship accounts and the Gillam account into the firm trust account, and in some cases, the firm fee account. Once those funds were misappropriated, allegedly at Bryant's direction, they became commingled with all other moneys generated within the firm. Whether Ms. Loftin then redirected these funds for her own personal use was pure speculation. Accordingly we conclude that the trial court did not abuse its discretion in excluding these checks from evidence. Ward v. State, 589 So.2d 777, 778
(Ala.Cr.App. 1991) ("The trial Court may exclude evidence when it is of a nature which would serve as a basis for nothing more than mere conjecture or remote inference.").
Furthermore, Reid and other witnesses were permitted to testify that Ms. Loftin had acquired large sums of money from the appellant's firm. Thus, evidence that at least one of Bryant's employees was "dipping" into the firm's accounts was before the jurors for them to draw whatever inferences they considered appropriate. Bryant was not prejudiced by the exclusion of the checks written by Ms. Loftin out of the firm fee account and deposited into her personal account.
 V.
Bryant intimates in his discussion of Issue III in his brief to this Court that the trial court improperly limited his defense by not allowing him to call Thomas Harrison as a witness and by limiting the testimony of two other witnesses. Warren West and Wesley Blacksher.
Harrison was the lead prosecutor in this case. Bryant informed Harrison before trial that he intended to subpoena him to testify about office furniture that he had purchased on credit while sharing office space with Bryant. Bryant paid the note on Harrison's furniture after Harrison left private practice to join the district attorney's office. Bryant argued that this evidence was relevant to show his mental state, because it would establish that he was spending money irrationally. The trial court quashed the subpoena.
A trial court's order to quash should be reversed only for an abuse of discretion. Williams v. State, 489 So.2d 4, 8
(Ala.Cr.App). 1986). As set out previously in this opinion, defense counsel had ample opportunity to demonstrate Bryant's irrational spending habits, without calling the lead prosecutor to the stand. The conclude that the trial court did not abuse its discretion in granting the prosecution's motion to quash the subpoena.
Bryant further maintains that the trial court improperly limited his direct examination of Warren West, one of Bryant's neighbors. West was permitted to testify at length concerning Bryant's general behavior *Page 879 
in recent years; however, the trial court refused to permit West to testify concerning Bryant's behavior at neighborhood social events. Bryant contends on appeal that this testimony would have shed light on his mental state. failed to make an offer of proof at trial establishing how this testimony would have been relevant. Thus this contention is not preserved for our review. Wood v.State, 602 So.2d 1195, 1198 (Ala.Cr.App. 1992).
Bryant further contends that the trial court improperly limited his direct examination of Wesley Blacksher. Specifically Bryant claims that the trial court did not permit him to question Blacksher about "the irrational payments to him from Mr. Bryant's account" and that this prejudiced his defense. (Appellant's brief at 36.) In his offer of proof Bryant argued that this testimony was relevant to show his mental state.
The record reveals that the trial court allowed Bryant to elicit testimony that Blacksher's wife received her paycheck from Bryant's personal account at the Spanish Fort bank, and that both Blacksher and his wife received $1,000 checks that were written on the Spanish Fort account as a wedding gift. The trial court, however, did not permit Bryant to introduce the checks illustrating these payments into evidence because the checks were merely cumulate of other testimony concerning the appellant's spending practices, excluding then was not error. Mayfield v.State, 591 So.2d 143, (Ala.Cr.App. 1991).
Based on the foregoing judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.
[1] At oral argument before this Court, Bryant's counsel stated that the trial court often required that he argue his motions and objections at a later time, outside the presence of the jury. He contended that this is what occurred in this instance.